# Exhibit F

1          There she is.  Good morning, Ms. Flaherty.

2    Can you hear me okay?

3          THE WITNESS:  I can.  Can you hear me?

4          THE COURT:  Yes.  I'm going to swear you in.

5    I'll have you raise your right hand.  Do you affirm

6    and attest that the testimony you are about to give is

7    the truth?

8          THE WITNESS:  Yes.

9          THE COURT:  Thank you.

10          Go ahead.

11           D I R E C T   E X A M I N A T I O N

12    BY MR. MENSIK:

13       Q.   Good morning.  My name is Matthew Mensik.

14    We've never met in person.  This is the first time I'm

15    seeing you.

16       I did speak with you last week; is that correct?

17       A.   That's correct.

18       Q.   Okay.  And I just want to start with this.

19    Can you state your name for the record, spelling it,

20    as well.

21       A.   Rebecca Flaherty, R-E-B-E-C-C-A

22    F-L-A-H-E-R-T-Y.

23       Q.   And what is your current address?

24       A.   21 -- my home address?

25       Q.   Yes.

25-80038-FPC   Doc 24-6   Filed 12/29/25   Entered 12/29/25 21:52:50   Pg 2 of 22

1      A.    2125 South -- oh, wait.  Do I need to provide

2  that?

3            THE COURT:  Just your work address, please.

4            THE WITNESS:  My work address.  I don't know

5  my work address off the top of my head, but I can get

6  that.

7            1338 North Liberty Lake Road, Liberty Lake,

8  Washington 99019.

9      Q.    (BY MR. MENSIK)  Where do you work?

10      A.    Where?

11      Q.    Yeah.

12      A.    John L. Scott.  It's a brokerage firm in

13  Liberty Lake.

14      Q.    How long have you worked there for?

15      A.    About three years.

16      Q.    And what's your current job?  Are you a real

17  estate agent?

18      A.    Yes.

19      Q.    How long have you been a real estate agent

20  for?

21      A.    For about four years.

22      Q.    And if you can just, for the Court, explain

23  what a real estate agent does, just a brief summary.

24      A.    Helps people buy and sell homes, facilitates

25  the contracts of buying and selling homes.

1     Q.  You may not be able to see in the courtroom,

2  and I don't know how good your camera is, but to my

3  right, I've got the defendants, Eric and Susan Young.

4  Do you remember meeting them before today?

5     A.  I do.

6     Q.  Okay.  And I don't know if you can see in the

7  back -- and maybe you can -- but I've got Linda and

8  Ted Cole; can you see them?

9     A.  I think I can see Ted.

10     Q.  Okay.  And do you remember meeting Ted before

11  today?

12     A.  I do.

13     Q.  All right.

14     THE COURT:  I think if you moved, Mr. Mensik,

15  she could see Ms. Cole.  There you go.

16     THE WITNESS:  Okay.

17     Q.  (BY MR. MENSIK)  And do you recognize both of

18  them?

19     A.  I do.

20     Q.  I want to talk to you about your interactions

21  with the parties, and I want to go back kind of to the

22  beginning as best as I can.  When were you first

23  contacted by either the Youngs or the Coles, first

24  contact ever?

25     A.  First contact ever was April 25th, 2023.

25-80038-FPC   Doc 24-6   Filed 12/29/25   Entered 12/29/25 21:52:50   Pg 4 of 22

1  Linda Cole contacted me via -- I advertise on Zillow,

2  so she contacted me through Zillow regarding a

3  property.

4      Q.  Okay.  And do you have any understanding of

5  where she learned about that property from?

6      A.  My guess would just be Zillow because

7  that's -- you know, you log into Zillow, or you're on

8  the Zillow application.  There's a home that you like.

9  Okay.  Would you like to contact an agent?

10     Q.  Did you have any other contacts with Ms. Cole

11 at that time?

12     A.  I think I answered a couple of questions

13 regarding the -- a lot, and then that was the end of

14 that communication.

15     Q.  In -- in that time period, did you end up

16 purchasing or helping Ms. Cole purchase a lot?

17     A.  No.

18     Q.  When is the next time that you were

19 contacted, either by the Coles or the Youngs?

20     A.  I was contacted by Mr. Young to tour a

21 property October 9th, 2023.

22     Q.  Previously to October 9th, 2023, had you ever

23 spoken to Mr. Young?

24     A.  There had been a text message via Zillow in

25 -- around the same time, April 25th, regarding a

1   property, 2710 West Strong Road, and then nothing came

2   of that.

3       Q.   So that was Mr. Young reaching out to you,

4   you said what -- April what again?

5       A.   April 25th.

6       Q.   Regarding a lot -- or a property?

7       A.   Yes.   Yes.

8       Q.   Was that before -- and I apologize.   Was that

9   before or after Ms. Cole reached out to you?

10      A.   I would have to double check.   I don't recall

11  if that was -- I don't recall if it was the same day.

12      Q.   Okay.

13      A.   Let me check.   I can check if you want.

14      Q.   Sure.   Okay.

15      A.   My -- Linda Cole, October -- sorry.   April

16  24th, 2023.

17      Q.   And then Mr. Young was --

18      A.   Mr. Young, April 25th, one day later.

19      Q.   Okay.   And in that communication from

20  Mr. Young on April 25th, 2023, did you have an

21  understanding of -- of what he was doing contacting

22  you, other than just asking about this property?

23      A.   Yeah.   He was just -- let me look here.

24      He -- yeah, he was just asking for information

25  related to, you know, building on a vacant lot.

25-80038-FPC   Doc 24-6   Filed 12/29/25   Entered 12/29/25 21:52:50   Pg 6 of 22

1     Q.   Okay.  Let's go to October 9th, 2023.  Is

2  that the date that Mr. Young reached out to you again?

3     A.   Yes.

4     Q.   Okay.

5     A.   I got a request to -- yeah, view a property.

6     Q.   Okay.  And what do you remember about that?

7  Was it via text or email, or was it a call?

8     A.   It was a text.

9     Q.   Okay.  And do you know how he got your

10  information?

11     A.   Through Zillow.

12     Q.   And on the 9th, did you correspond with

13  Mr. Young and make plans about seeing houses?

14     A.   Yeah.  We texted for a couple of days, and

15  then looks like we went and looked on the 11th.

16     Q.   Okay.

17     A.   We texted, you know, about different

18  properties, making appointments.

19     Q.   Okay.  And those were just texts between you

20  and Mr. Young?

21     A.   Yes.

22     Q.   And based on those communications with

23  Mr. Young -- it sounds like on the 9th and the 10th of

24  October -- what did you understand Mr. Young was

25  trying to do?

1     A.   Look at homes.  Tour homes.

2     Q.   Okay.  Did -- did you have any correspondence

3  or text messages with Ted and Linda Cole during that

4  time period?

5     A.   No.

6     Q.   I want to talk about looking at these homes.

7  So when was the first date that you showed homes to

8  Mr. Young?

9     A.   October 11th.

10     Q.   Okay.  And how many homes, approximately, did

11  you show?

12     A.   I think we looked at three homes that day,

13  three or four.

14     Q.   Were the Coles present during those showings?

15     A.   Yes.

16     Q.   Now, who was your client in -- in the

17  attorney world, we have a client.  Somebody comes to

18  us; that's our client.  Does real estate have

19  something similar where if somebody comes to them,

20  they have a client -- like, they have a duty to them;

21  they're working for them?

22     A.   Yes.

23     Q.   Okay.  And in this instance, was Mr. Young

24  your client?

25     A.   Yes.

25-80038-FPC   Doc 24-6   Filed 12/29/25   Entered 12/29/25 21:52:50   Pg 8 of 22

1     Q.   Okay.  Were the Coles your client?

2     A.   No.

3     Q.   Did you know that the Coles wanted to

4 purchase this house?  And I'm talking October 11th.

5     A.   No.

6     Q.   October 12th, did you know that the Coles

7 wanted to purchase that house?

8     A.   No.

9     Q.   Okay.  What did you understand when -- you

10 were showing the house, and the Coles were there; what

11 was your understanding of why the Coles were there

12 with the Youngs looking at this house?

13     A.   My understanding was that they were going to

14 be cohabitating, that the Coles were moving to be

15 closer to their family, the Youngs, and that they were

16 looking for a home that would, you know, support that

17 multifamily living.

18     Q.   On October 11th, did you have any discussions

19 at all with Mr. Young about where the purchase -- what

20 the down payment or the purchase of this home was

21 going to be?  That's a bad question.  I apologize.

22     On October 11th, was there any conversation with

23 Mr. Young about where the money was going to come from

24 for the down payment of that house?

25     A.   Not on October 11th, no.

25-80038-FPC   Doc 24-6   Filed 12/29/25   Entered 12/29/25 21:52:50   Pg 9 of 22

1      Q.   Okay.  I know that you became aware of a

2  lawsuit involving this transaction.  So I'm going to

3  say prior -- prior -- well, strike all that.

4      I'll get to that, and I apologize.  I'm trying to

5  make this a little more streamlined.

6      Let's go to the house that's kind of at question

7  here.  And what the -- the Golden Court house.  Do you

8  remember what the address of that is?

9      A.   I don't -- not off the top of my head, but I

10 can easily -- it's easy for me to find.

11     Q.   Well, let's go to Exhibit 9.

12     A.   Okay.

13     Q.   Okay.  And here, in Exhibit 9, if you can

14 just look at that and just refresh your recollection,

15 what are we looking at here?

16     A.   The purchase and sale agreement for Golden

17 Court.

18     Q.   And -- and on this purchase and sale

19 agreement, do you see the house listed there, the

20 property?

21     A.   Yes, 1004 East Golden Court.

22     Q.   We're just going to refer to that as "the

23 house" from here on out for the rest of this

24 conversation.

25     A.   Okay.

1      Q.  On this date -- well, let me ask you this.

2      When did -- did Eric Young tell you that he wanted

3  to put an offer down on this house?

4      A.  Yes.

5      Q.  Okay.  And what date was that?

6      A.  The 13th.

7      Q.  Okay.  So on the 13th, he told you he wanted

8  to put an offer down.  Was this residential purchase

9  and sale agreement signed on that day?

10     A.  It was.

11     Q.  Is -- are the Youngs listed as purchasers on

12  this agreement?

13     A.  Just Eric.

14     Q.  Okay.  As you sit here today, is there any

15  reason that you can think of why the Coles couldn't be

16  listed as purchasers on this house?

17     A.  If they weren't party to the loan.

18     Q.  Okay.

19     A.  That would be a reason.  But no, that would

20  just -- no.  There's no reason.  It could be -- they

21  could be on the loan.  They could be on the purchase

22  and sale agreement.

23     Q.  What -- what was the closing date on this

24  house?  Well, let me start back.  Let me go back for

25  the Court to have a full understanding.

1      Was -- Mr. Young put down an offer on this house,
2 correct?
3      A.   Correct.
4      Q.   And that offer was accepted?
5      A.   Correct.
6      Q.   When was the closing date for the sale of
7 this house?
8      A.   It would have been November 13th, 2023.
9      Q.   So that -- from the date of signing to the
10 date of closing is about 30 days; is that fair?
11     A.   Yeah.
12     Q.   Okay.  In a typical real estate transaction,
13 how -- how long before the actual closing date do
14 funds need to be provided for the purchase of a home?
15     A.   Okay.  So the question is, how -- when did
16 they need to provide the funds to close?
17     Q.   Yes.
18     A.   Before closing?  The lender will usually wire
19 those over a day or -- a day or same day as closing.
20     Q.   Okay.  So in this case, November 12th or
21 13th, had this house closed?
22     A.   Yes.
23     Q.   Okay.  Is there any reason that you can think
24 of that the down payment -- the down payment for the
25 house needed to be provided October 16th or 17th?

25-80038-FPC    Doc 24-6    Filed 12/29/25    Entered 12/29/25 21:52:50    Pg 12 of 22

1        MS. YOUNG:  Objection, calls for speculation.

2        MR. MENSIK:  Just asking if she knows any

3  reason.

4        THE COURT:  Overruled.  You can answer that

5  question.

6        THE WITNESS:  Will you repeat the question?

7     Q.  (BY MR. MENSIK)  Yeah.  Is there any reason,

8  as you sit here today, that you know of why the down

9  payment for the house would need to be provided by

10  October 16th or 17th?

11     A.  No.  No.  The earnest money is the only thing

12  that's due three days after mutual acceptance, which

13  is one percent of the purchase price.  That would be

14  the only thing.  In this case, it would have been,

15  like, $6,000.

16     Q.  You -- do you recall fielding a telephone

17  call from my client, Linda Cole --

18     A.  Yes.

19     Q.  -- in October?

20     A.  Yes.

21     Q.  What date did you receive that call from my

22  client?

23     A.  I don't recall the exact date.

24     Q.  Okay.  Was it before you found out about the

25  lawsuit?

25-80038-FPC   Doc 24-6   Filed 12/29/25   Entered 12/29/25 21:52:50   Pg 13 of 22

1    A.  Yes.

2    Q.  Okay.  And what do you recall about that

3 conversation?

4    A.  That Linda seemed panicked and frantic.  She

5 wanted to know who was buying the house.  She seemed

6 confused that it wasn't her and Ted that were the ones

7 buying the house, that it was Eric buying the house.

8 Yeah.

9    Q.  When -- and what were the words you used to

10 describe -- I can't -- did you say "panicked?"

11 "Frantic"?  I can't remember the words.

12    A.  Yeah, panicked.  She seemed panicked,

13 frantic.

14    Q.  And did she ask you what she should do during

15 that call?

16    A.  She asked me to cancel the transaction, which

17 I could not do, because she was not a party to the

18 transaction.  The contract was between Eric and the

19 sellers, and Linda and Ted were not part of that.  I

20 could not cancel it.

21    Q.  I'm going to take you to Exhibit 6.

22    A.  I don't -- I did not get Exhibit 6.  I got 9,

23 10, and 15.

24    Q.  That's fine.  We can go -- well, I don't have

25 to show you.

25-80038-FPC   Doc 24-6   Filed 12/29/25   Entered 12/29/25 21:52:50   Pg 14 of 22

1    Do you recall receiving some letters for attorneys

2 from the Coles in November -- October/November of

3 2023?

4    A.   I do remember.

5    Q.   Okay.  And what do you remember, the general

6 gist of those letters?

7    A.   The letter, I remember -- it was -- it was,

8 like, a cease and desist.  I don't know the actual

9 term, but it was -- it was pretty much asking for the

10 transaction to be canceled.  And I forwarded it to the

11 attorney at John L. Scott and, you know, yeah.  That

12 was the gist of it, and I think the problem was that

13 it was an attorney from Oregon.  And yeah.  So

14 anyways, I sent it to the attorney at John L. Scott to

15 take care of.

16    Q.   Okay.  Were you made aware that a temporary

17 restraining order was entered in this current lawsuit

18 relating to the -- the sale of the house?

19    A.   I was made aware, yes.

20    Q.   Okay.  And generally, what were you -- what

21 was your understanding of what the TRO was doing as it

22 relates to the purchase of this house?

23    A.   That there was a conflict of some sort

24 regarding funds and that there was a stop on the

25 purchase of Golden Court.

```
1          Q.   I would like to take you to Exhibit 10.  Do
2     you have Exhibit 10 in front of you?
3          A.   I do.
4          Q.   Okay.  And what are we looking at in Exhibit
5     10?
6          A.   This is an email from the title and escrow
7     company, Magan Ham -- no, sorry.  It's from Mr. Young
8     to Magan on December 29th.  And it looks like he is
9     asking for wire instructions for earnest money.
10         Q.   So what do you -- walk me through this.  So
11    Mr. Young says, "Hello, Magan.  I need wire
12    instructions for earnest money on the escrow, please.
13    I know it's Umpqua.  Let me know if questions" -- it's
14    a typo.
15         Do you know what Mr. Young is referring to when
16    he's talking about earnest money?
17         A.   I think he's asking for the wire instructions
18    so that he can send earnest money.
19         Q.   And let's go back to October of 2023.  Do you
20    recall if earnest money was paid on the Golden Court
21    house?
22         A.   Yes, earnest money was paid.
23         Q.   And then we're here in December, late
24    December 2023, and Mr. Young is talking about other
25    earnest money.
```

```
 1        A.   Yeah.  So the sellers of Golden Court were
 2   giving us extensions to keep the deal together because
 3   they were made aware that there was a legal issue, and
 4   so they were -- usually if the sale doesn't go through
 5   within the allotted 30 days -- that's based on the
 6   contract -- they can extend, or we can come to some
 7   agreement to extend, and they were asking for
 8   additional earnest money.
 9        Q.   And then do you remember how much additional
10   earnest money that the sellers asked for?
11        A.   I don't remember what -- yeah.  I could
12   drudge that up, but I don't remember exactly what the
13   dollar amount was.
14        Q.   Okay.  Go to Exhibit 15.
15        A.   Okay.
16        Q.   Can you tell me what we're looking at here?
17        A.   This is an email from Magan from the title
18   company -- title and escrow company, and she's
19   referring to the other email we just discussed, saying
20   that she received the email below asking for wire
21   instructions, and she's saying because of this court
22   order, they can't accept any additional funds.  So she
23   was not going to give wire instructions to Mr. Young
24   because they didn't want to accept any funds related
25   to this transaction because of the TRO.
```

1      Q.   Now, if you go to that email from Magan Ham,

2   at the last line there, it says $10,000; do you see

3   that?

4      A.   I do, yes.

5      Q.   Does that refresh your recollection about the

6   additional escrow?

7      A.   That does, yes.

8      Q.   So is it -- based upon the email and your

9   memory being refreshed -- December of 2023, Mr. Young

10  was trying to provide an additional $10,000 of earnest

11  money to continue the purchase of this house?

12     A.   Yes.

13     Q.   What did you -- did you have any thoughts

14  about that, about Mr. Young trying to provide this

15  additional $10,000 with this -- this court order in

16  place?

17          MS. YOUNG:   Objection, calls for conclusion.

18          THE COURT:   Overruled.   You can answer that

19  question.

20          THE WITNESS:   I thought it was not a good

21  idea.   It seemed like this was nonrefundable earnest

22  money, and it didn't seem like the deal was going to

23  go through or the sellers, you know, were going to get

24  to keep this money.   Yeah.

25          MR. MENSIK:   No other questions -- no further

```
 1    questions for the witness at this time, Your Honor.

 2              THE COURT:  Thank you.

 3                C R O S S - E X A M I N A T I O N

 4    BY MS. YOUNG:

 5        Q.   Hi, Rebecca.  Thank you for taking your time

 6    today.  I appreciate it.  Sorry about all of this.  I

 7    just have a couple of questions for you.

 8        So I understand your testimony a moment ago was

 9    that Plaintiff, my mother, called you in panic.  Were

10    those your words?

11        A.   Yes.

12        Q.   Okay.  She -- you also said that she and my

13    stepdad, Ted, were present when we went to look at

14    houses; is that correct?

15        A.   Correct.

16        Q.   Okay.  And your understanding, as you

17    testified earlier, was that we were going to be

18    cohabitating together in the same house, they were

19    moving up from the Baker City area to the Spokane

20    area, and that we were all going to be together, and

21    this was for their elder care assistance and so on and

22    so forth; is that correct?

23              MR. MENSIK:  Objection.  Misstates testimony,

24    Your Honor.

25              THE COURT:  I guess you can ask her if that's
```

1    that's not my scope of work.  My scope is what do you

2    want to offer on the house, what do you want to put

3    down, what's your earnest money.  As far as, like, the

4    funds are concerned, that's not something I'm dealing

5    with.

6              MS. YOUNG:  Okay, got it.  Thank you.  And

7    let me just see if I have anything else.  I think

8    that's all I have.  Okay.  I think that's all I have.

9         Oh, actually -- no.  Not really.  That's all I

10   have, Ms. Flaherty.  Thank you very much.  I

11   appreciate your time.

12             THE COURT:  Mr. Young, any cross?

13             MR. YOUNG:  No questions.  Thank you.

14             THE COURT:  Okay.  Any redirect?

15             MR. MENSIK:  Yes, Your Honor briefly.

16             R E D I R E C T   E X A M I N A T I O N

17   BY MR. MENSIK:

18        Q.  I want to kind of go back chronologically or

19   start at the kind of last interaction with Ms. Cole.

20   Ms. Cole called you, and you testified to what she

21   said.  Have you ever received a call like that before?

22        A.  No.

23        Q.  Do you know anybody that's received a call

24   like that before?

25        A.  No, I don't.

25-80038-FPC    Doc 24-6    Filed 12/29/25    Entered 12/29/25 21:52:50    Pg 20 of 22

1      Q.   I want to talk about when you -- you were
2  showing houses on the 11th, and the Youngs and the
3  Coles were together.  Do you recall any instance in
4  which the financing of the home was discussed between
5  the Coles during those showings -- or the Coles and
6  the Youngs during those showings?
7      A.   No.
8      Q.   Do you recall the Coles or the Youngs during
9  those showings telling you about what the down payment
10  was for this house and who was going to provide it?
11      A.   No.
12      Q.   Did you ever ask the Coles during that
13  conversation whether they intended to purchase the
14  house?
15      A.   I did not.
16           MR. MENSIK:  Okay.  No further questions for
17  this witness, Your Honor.
18           THE COURT:  I have one question.  Do you
19  remember what the down payment amount was going to be?
20           THE WITNESS:  I don't.  I can find that, if
21  you would like me to look.
22           THE COURT:  Sure.  Thank you.
23           THE WITNESS:  $123,000.
24           THE COURT:  And the total purchase price?
25           THE WITNESS:  Let me see here.  $618,000.

1          THE COURT:  Okay.  Thank you.  Those are all

2    my questions.

3          Can Ms. Flaherty be excused?

4          MR. MENSIK:  Yes, Your Honor.  She's here via

5    subpoena.  She's excused from her subpoena and

6    everything.

7          THE COURT:  Okay.  Thank you, Ms. Flaherty.

8    Appreciate your time.

9          MR. MENSIK:  Thank you.

10          THE COURT:  Okay.  I'm assuming you don't

11    have a witness you can complete in nine minutes.

12          MR. MENSIK:  No, Your Honor.  I do not.

13          THE COURT:  Let's break for lunch, and let's

14    come back at 1 o'clock.  We'll start right at 1

15    o'clock, okay?  Thank you.

16          For security purposes, today is our

17    protection order docket, so security is usually

18    longer.  So plan accordingly for that, okay?

19          MR. YOUNG:  Coming back in?

20          THE COURT:  Coming back in.

21          (Recess taken.)

22          THE COURT:  Counsel, your next witness.

23          MR. MENSIK:  Yes, Your Honor.  We call Eric

24    Young.

25          THE COURT:  Okay.  Mr. Young, go ahead and