# Exhibit H

```
 1              MR. MENSIK:  Nothing from me, Your Honor.
 2              THE COURT:  You can go ahead and step down,
 3    Ms. Young.
 4              Your next witness.
 5              MR. MENSIK:  Yes, Your Honor.  That's going
 6    to be Linda Cole.
 7              THE COURT:  Okay.  Ms. Cole, I'll have you
 8    come right up to the witness stand.
 9              Ms. Cole, I'm going to swear you in.  I'll
10    have you raise your right hand.  Do you affirm and
11    attest that the testimony you are about to give is the
12    truth?
13              THE WITNESS:  Yes.
14              THE COURT:  Thank you.
15                D I R E C T   E X A M I N A T I O N
16    BY MR. MENSIK:
17       Q.  Ms. Cole, can you please state your full name
18    and spell it, as well.
19       A.  Linda -- excuse me.  Linda Jean Cole,
20    L-I-N-D-A J-E-A-N C-O-L-E.
21       Q.  What's your birthday?
22       A.  January the 15th, 1944.
23       Q.  How old are you today?
24       A.  80.
25       Q.  How old are you going to be tomorrow?
```

25-80038-FPC    Doc 24-8    Filed 12/29/25    Entered 12/29/25 21:52:50    Pg 2 of 102

```
1        A.  81.
2        Q.  So you're going to spend your birthday here
3   in the courtroom?
4        A.  Mhm.
5        Q.  Where did you grow up?
6        A.  I grew up in Porterville, California.
7        Q.  And did you grow up there until you were
8   about -- until you were 18?
9        A.  About 15, I think, and then we moved.
10        Q.  Who are you married to?
11        A.  Ted Cole.
12        Q.  Is Ted Cole sitting in the courtroom here
13   today?
14        A.  Yes.
15        Q.  He's the gentleman behind me?
16        A.  Yes.
17        Q.  And you've been married to Ted for how many
18   years?
19        A.  About 40 years.
20        Q.  You get married in 1984?
21        A.  Yes.
22        Q.  How old is Ted?
23        A.  He's 70 -- let's see.  Okay.  How old is he?
24   He's 80 -- 80 years old.  Excuse me.  He's 83 years
25   old.
```

25-80038-FPC   Doc 24-8   Filed 12/29/25   Entered 12/29/25 21:52:50   Pg 3 of 102

```
 1            MR. COLE:  I agree.
 2            THE WITNESS:  I have my 80 and his 80s mixed
 3   up.
 4       Q.  (BY MR. MENSIK)  Do you two have any
 5   biological children together?
 6       A.  No, we don't.
 7       Q.  Oh, together -- yes, I apologize.  But you
 8   have one biological child, correct?
 9       A.  Yes.
10       Q.  And that is the defendant, Susan Young, to my
11   right?
12       A.  Yes.
13       Q.  How many grandchildren do you have?
14       A.  One.
15       Q.  And is that Jaeger?
16       A.  Yes.
17       Q.  It's a weird question.  Does Ted have a glass
18   eye?
19       A.  No.
20       Q.  I want to talk about your education, just
21   briefly, okay?  I don't want to spend a lot of time
22   talking about college classes.  But where did you
23   graduate high school?
24       A.  Taft, California.
25       Q.  What year was that?
```

25-80038-FPC   Doc 24-8   Filed 12/29/25   Entered 12/29/25 21:52:50   Pg 4 of 102

1     A.   1961.

2     Q.  And then just briefly -- just briefly --

3  after graduating high school, can you kind of just

4  tell me about any education or anything like that that

5  you got?

6     A.  Yes.  I had a scholarship out of high school

7  to go to beauty school, and I did.  I got my

8  cosmetology license.  And then I have -- had attended

9  other colleges later, because at that time, the

10  computers were just coming in.  You know, everybody

11  was learning.  So I figured that was the way it was

12  going to be.  I needed to have some classes.  So I

13  went there and did classes and -- at Sacramento

14  Business College and a couple of other classes later

15  at other colleges.

16     Q.  Okay.  Did you go to school to get a little

17  bit of a business degree?

18     A.  Yes.

19     Q.  Okay.  And was that in Sacramento?

20     A.  Yes.

21     Q.  And that is just a one-year degree?

22     A.  Yes.  Mhm.

23     Q.  I want to talk about how long you've been

24  working for.  You've been working for a little bit.

25     A.  Mhm.

25-80038-FPC   Doc 24-8   Filed 12/29/25   Entered 12/29/25 21:52:50   Pg 5 of 102

1      Q.   When did you stop working?  How old were you?

2      A.   75.  74.

3      Q.   How old were you when you started working?

4      A.   17.

5      Q.   So you almost worked for 60 years?

6      A.   Yes.

7      Q.   Are you retired now?

8      A.   Yes.

9      Q.   You living off Social Security?

10     A.   Yes.

11     Q.   Do you have any other sources of income,

12 other than your Social Security?

13     A.   Yes.  I have a small pension from working at

14 the hospital for 10 years, and then I have -- I have a

15 -- a -- it was an alimony case a few years ago.  I

16 have some money coming in from that.

17     Q.   Okay.  How much is that?

18     A.   The total of both of them is about $460 or

19 something like that.

20     Q.   Do you remember how much your Social Security

21 is?

22     A.   About -- just mine?

23     Q.   Just yours.  Or is it easier --

24     A.   $1,062 or something like that.

25     Q.   And then obviously, you're married to Ted.

25-80038-FPC    Doc 24-8    Filed 12/29/25    Entered 12/29/25 21:52:50    Pg 6 of 102

1    A.   Mhm.

2    Q.   Does Ted have any pensions?

3    A.   No.

4    Q.   Does Ted just have Social Security?

5    A.   Yes.

6    Q.   Okay.  So between the two of you, how much

7    Social Security do you get per month?

8    A.   Well, including what I have, the other

9    things, it's about 29 -- $2,900.

10   Q.   So that's between the Social Security for

11   both you and Ted and the pension?

12   A.   Right.

13   Q.   And the alimony?

14   A.   Mhm.

15   Q.   I want to talk just a little bit about the

16   jobs you have had over the years.  We don't need to go

17   kind of a detailed recitation of everything, but if

18   you can just give the Court a sense of the kind of

19   jobs that you've had over the years so she can get a

20   sense of who you are.

21   A.   I can say I was a cosmetologist, and then

22   later, I -- I went into restaurant management.  I was

23   manager of a restaurant.  That was for about four

24   years.  And then I also went to -- because of the

25   classes that I took, I went to work at the hospital

Linda and Ted Cole v. Eric and Susan Young
Trial - Volume II of II

1  for about 10 years.

2      I also worked for about two years with a tribe

3  over in the Bay Area there.  They were doing a grant,

4  and so I worked there for them for about two years.

5  Because -- I got hired because I was -- I'm Eastern

6  Shawnee, so they wanted me on there right away.

7      And then I have also done truck driving with my

8  husband for many years.  And I also worked at another

9  hospital for several years.  And I did all that -- the

10  reason I quit was because his mom needed our help, and

11  I had to go to help.

12      Q.  Okay.  I'll kind of stop you there.  You've

13  had a full life of careers and jobs.  I want to talk

14  just about Ted.  And do you remember when he stopped

15  working?  Well, is Ted retired?

16      A.  Yeah, he's retired.

17      Q.  Okay.  When did he stop working?

18      A.  Let's see.  He stopped working in -- well, he

19  stopped working in 2016, but then he -- he got another

20  job when we moved later, and he worked for a little

21  bit there.  So that was in 2017, I believe.

22      Q.  Now, it sounds -- kind of a silly question.

23  We've been here for two days now.  But who is Eric

24  Young?

25      A.  That's my son-in-law, married to my daughter.

25-80038-FPC   Doc 24-8   Filed 12/29/25   Entered 12/29/25 21:52:50   Pg 8 of 102

1     Q.  And he's sitting to my right?

2     A.  Yes.

3     Q.  Now, I want to go to your -- I want to talk

4 about your relationship with the defendants.  And I

5 kind of want to start with your relationship with your

6 daughter around the age of 21.

7     A.  Mhm.

8     Q.  Okay.  And was Susan living with you when she

9 was 21?

10    A.  Yes, up until she was 21 -- almost 21.  A

11 couple days.

12    Q.  And then what happened?

13    A.  Well, she was there with us until she was

14 about 21, and then after that, she -- we literally

15 told her that she had to leave.

16    Q.  Okay.  And why was that?

17    A.  Because she was not obeying our family rules.

18    Q.  Did she get married to Mr. Young around that

19 time?

20    A.  Yes.  Just a few days or so, I guess, after

21 that -- within the week or so.  Somewhere.

22    Q.  Now, I want to talk about how long -- when

23 Mr. and Mrs. Young got married, did they live nearby

24 you?

25    A.  They were in the area where we were, yes, for

1    about three or four years, I guess.

2        Q.   You say they were in the area for three or

3    four years; did something happen?

4        A.   Yeah.  They moved away.

5        Q.   Did you know where they went to when they

6    moved away?

7        A.   I knew that they were -- well, I knew they

8    were working in the -- by Sacramento.  And then after

9    they -- they moved away from our area, we didn't know

10   where they had gone.

11       Q.   Did they tell you where they went?

12       A.   No.

13       Q.   And when was the next time that you spoke to

14   Susan after -- after they kind of quit this contact

15   with you?

16       A.   About 2008.

17       Q.   One of the -- Eric testified earlier it was

18   about 2005.  Does that sound --

19       A.   Oh, I'm sorry.  Yes, yeah.  I'm thinking of

20   when we -- yeah, when they went up to Texas.  It was

21   about 2005, yes.

22       Q.   So how many years was it that you didn't

23   speak to the defendants for?

24       A.   Probably over 10 years.

25       Q.   Okay.

25-80038-FPC   Doc 24-8   Filed 12/29/25   Entered 12/29/25 21:52:50   Pg 10 of 102

1    A.   We didn't know where they were -- had no

2  contact with them.

3    Q.   So tell me about the first time you had

4  contact with the defendants there in 2005.

5    A.   Well, I was sleeping in bed, and the phone

6  rang, and I answered the phone, and it was Susan --

7  Susanann on the phone.

8    Q.   Were you surprised?

9    A.   I was shocked.

10    Q.   Did you see the defendants after that phone

11  call?

12    A.   In 2005?  Let's see.  2005 -- I'm trying to

13  think where they were.  Yes, we saw them later.  Mhm.

14    Q.   Okay.  Where were they living?

15    A.   They were living in Santa Rosa.  Somewhere --

16  somewhere in the coastal area.  Redwood City,

17  somewhere over there.

18    Q.   Now, did the Youngs move to Texas?

19    A.   Yes, they did.

20    Q.   And when approximately did they move to

21  Texas?

22    A.   About 2008.

23    Q.   Okay.  Mr. Young said it was 2006; do you

24  have any reason to disagree with that?

25    A.   Oh, they --

        MS. YOUNG:  Objection, Your Honor.  Misstates
testimony.

        MR. MENSIK:  Well, 2005, rather.  I think you
said 2005.

        THE COURT:  Do you still have an objection?

        MR. YOUNG:  Objection.  This is leading the
witness on direct.

        MS. YOUNG:  No, it's okay.  He corrected the
date.  We're good.

        THE WITNESS:  I was working at the hospital
at that time.  Yeah.  It was around that time.  2000
-- they were -- yeah.  They were over in Redwood City,
and then they went over there, because Jaeger was born
about 2008, I guess.  And we made a trip over to see
them in 2003 for a convention.  Six, excuse me.  2006
for a convention.  We actually flew over there --
first time I had ever flown on a plane -- went over
there.

    Q.   Now, I want to talk to you about going down
when Jaeger was born in Texas -- or after Jaeger was
born.  Can you tell me about that?

    A.   Mhm.  We went down there about 2009.

    Q.   Okay.  So this is after Jaeger is born?

    A.   Mhm.

    Q.   And how long did you stay there in Texas for?

25-80038-FPC   Doc 24-8   Filed 12/29/25   Entered 12/29/25 21:52:50   Pg 12 of 102

1      A.   2009.  We were there for about -- not very

2   long.  About a year and a half.

3      Q.   Where did you live when you came down to

4   Texas?

5      A.   Where were we living before we came, or when

6   we came down there?

7      Q.   Well, when you came to Texas -- yeah.  Where

8   did you live?

9      A.   They had gotten an apartment or something

10  there for us when we moved down there, and it was

11  nothing that we wanted and not our style of living.

12  So we moved immediately over to a duplex that we

13  liked, and that's where we were.

14     Q.   Okay.  Now, I think Mr. Young testified that

15  they put a -- they, like, paid the first month rent or

16  something on this apartment that you got when you came

17  down there; is that accurate?

18     A.   Yes.

19     Q.   Okay.  How far away did you live from the

20  Youngs when you were down there in 2009, when you

21  ultimately got that place that you liked?

22     A.   Well, we were in Willis, and they were over

23  in Montgomery.  It was a good 20, 30 minutes, I think,

24  drive from where we were to where they were.

25     Q.   When you lived down in Texas on that

25-80038-FPC    Doc 24-8    Filed 12/29/25    Entered 12/29/25 21:52:50    Pg 13 of 102

1  occasion, how often did you see the Youngs?

2      A.   Well, not very often.  She came to our house

3  about two times -- two different times.

4      Q.   Okay.  Now, Mr. Young talked earlier about

5  you working down there at his house, and I can't

6  remember exactly what it was.

7      A.   Right.

8      Q.   Do you remember anything about that?

9      A.   Mhm.  Yeah.

10      Q.   What do you recall about that?

11      A.   That she wanted -- they wanted to try to get

12  me a job, and so she had the baby, and she wanted me

13  to come and do household chores and stuff like that to

14  free her up.  So that -- I did for a little bit.  But

15  it got to be where I didn't need to be there, so I

16  didn't stay there.

17      Q.   How long did you do these household chores

18  for?

19      A.   Maybe a month or so, but not very long.

20      Q.   And why did you quit?

21      A.   Just family.  I didn't need to.  And then Ted

22  was going to work.  He started working at Wal-Mart, so

23  I didn't need to be there.

24      Q.   Okay.  How was your relationship with the

25  Youngs that first time living down there in Texas?

25-80038-FPC    Doc 24-8    Filed 12/29/25    Entered 12/29/25 21:52:50    Pg 14 of 102

1     A.   Well, it seemed to be okay at first.

2     Q.   Okay.  And then what happened?

3     A.   Well, we didn't see them very often.

4  Eventually, we -- we left there and went back to

5  California.

6     Q.   Okay.  Before you left, there was mentions

7  earlier and testimony earlier about a -- a lot --

8     A.   Oh, yes.  We purchased --

9     Q.   -- you purchased.

10    A.   We purchased a lot there because they were

11  the ones who found it and told us about it, and they

12  said, oh, you gotta come and see that.  It was in the

13  Bentwater area where they were, which was a -- a

14  rather secluded, fancy area.  Again, not our style --

15  that was their way of living, but not ours.  And they

16  wanted us to -- to purchase this lot.

17     Well, the only way that lot could be purchased was

18  they had, like, $3,000 they wanted to put in on it.

19  And they were -- wanted to know what kind of funds we

20  had.  I said, we really don't have any.  And then she

21  was asking about our insurance policy.  And I said --

22    Q.   When you say "she," who are you talking

23  about?

24    A.   Susan.  Susanann.  And I didn't really know

25  this, so somebody had to have been doing some looking

25-80038-FPC   Doc 24-8   Filed 12/29/25   Entered 12/29/25 21:52:50   Pg 15 of 102

1    about that -- apparently, that you can draw money out

2    of an insurance policy if you have enough money paid

3    into it.  And she found out that I had $5,000 in

4    there -- $5,500, something like that.  And so they

5    wanted us to put $550,000 down on the property, and

6    they were going to pay $3,000 to get that lot.

7        Q.   You said 550.  Do you mean $5,500?

8        A.   I mean $5,500.  I'm sorry.

9        Q.   Now, with regards to that lot, were you --

10   were you listed as an owner on the title?

11       A.   Yes.

12       Q.   And were the Coles -- or were the Youngs also

13   listed as owners on the title?

14       A.   Yes.  And we did not want that lot.  We sat

15   there and talked and talked about it, and eventually,

16   they -- they persuaded us to go ahead and get it.

17       Q.   Was it important that you were on the title

18   of that lot?

19       A.   Yes.

20       Q.   And why is that?

21       A.   Well, we had the most money put down in that.

22       Q.   Okay.  Now, I want to talk to you about what

23   happened with that lot.  So walk me through what

24   happens with that lot after it's purchased.

25       A.   Well, after it's purchased, they got in the

25-80038-FPC    Doc 24-8    Filed 12/29/25    Entered 12/29/25 21:52:50    Pg 16 of 102

1   car.  Well, in fact, before it was purchased, before
2   we even went in there, when we jumped out of the car,
3   she was so anxious to get in there.  She's running in
4   there.  And she says, well, if you don't want this
5   lot, she says, we do.  And I thought, what?  Because I
6   thought that the lot was supposed to be for us.
7        So anyway, that's -- that's how we got talked into
8   getting the lot.  And then after the lot, we signed
9   papers and went over to look at the lot.  We were
10  standing -- sitting there in the car.  And all of a
11  sudden, they were in the front, and we were in the
12  back, and they were -- Eric was saying, well, we can
13  do this, and we can do that.  And I can put -- I can
14  put a stairwell that kind of comes down like this and
15  out, you know, so that I won't disturb anybody from my
16  business.  And we both looked at each other, and we
17  thought --
18       Q.  Did you say "we" looked at each other?
19       A.  Yeah, Ted and I.  And I thought, what did we
20  just get into?
21       Q.  Well, did that lot -- I mean, you don't own
22  that lot anymore, right?
23       A.  No.
24       Q.  So what happened with that lot?
25       A.  Well, when we left to go back to California,

25-80038-FPC   Doc 24-8   Filed 12/29/25   Entered 12/29/25 21:52:50   Pg 17 of 102

1  we were told by the -- someone that was -- knew about

2  those lots -- they told us that we didn't have to pay

3  anything if we went out of state.  If we were living

4  out of state, we didn't have to pay anything except

5  the taxes on the lot.  Well, that information was

6  proved to be false because when we got over to

7  California, some time later, we got a letter saying

8  that we owed X amount of dollars for HOA dues that

9  were supposed to have been paid every month, every

10  month.  We didn't know that.

11      Q.  So how much money in HOA fees accrued while

12  you were gone?

13      A.  Quite a lot.  Quite a lot more than what we

14  could afford.

15      Q.  So what, if anything, did Mr. Young do with

16  regards to his interest in the lot or the Youngs'

17  interest in the lot?

18      A.  When he found out that that's what had

19  happened, immediately, he sent us a letter of their --

20  getting his name off of the title.

21      Q.  Was that a quitclaim deed?

22      A.  Quitclaim deed.

23      Q.  So then what happened with the lot?  Was it

24  foreclosed on?

25      A.  Yes, it was, because we just couldn't pay all

25-80038-FPC   Doc 24-8   Filed 12/29/25   Entered 12/29/25 21:52:50   Pg 18 of 102

1  that money.  We didn't have it.

2      Q.   So who has the lot now?

3      A.   The -- the Bentwater.  The Bentwater got it

4  back.

5      Q.   I want to talk about you moving to

6  California.

7      A.   Mhm.

8      Q.   And you moved back.  Do you remember the

9  year, approximately, you moved back to California?

10     A.   From that time?

11     Q.   Yes.

12     A.   Let's see.  That was in 2000 -- let me get my

13 dates right here.  We went out there in 2009 the

14 second time.  I believe -- I'm -- I'm trying to

15 remember what the date was.  Okay.  2000 -- we got out

16 in Taft in 2010.  I'm not clear about that date.

17 2010, I believe it was.  Something like that.

18     Q.   All right.  So you went back to California,

19 and then how long did you stay in California for?

20     A.   We were in there -- we were in California

21 until 2016.

22     Q.   Okay.  And then in 2016, you went back to

23 Texas?

24     A.   2016, we went back to get our things from

25 Texas --

1      Q.  Okay.

2      A.  -- and come back.

3      Q.  Well, we'll talk about that in a second.  It

4 was a story earlier -- and I know you have been

5 listening to this -- in which Mr. Young talked about,

6 I believe, 2010, 2011 time frame -- I may not have the

7 dates right -- about helping you fix a house, or an --

8 I think he called it a mobile home.

9      A.  Oh, yes.

10     Q.  Do you remember that?

11     A.  Mhm.

12     Q.  Okay.  What house is he referring to?

13     A.  He's referring to a house that we purchased

14 in Lake County.  Lakeport -- Lakeport, California,

15 actually.

16     Q.  And what year, approximately, was that?

17     A.  This was about 1996 -- excuse me.  1998, '99,

18 somewhere around in there.

19     Q.  So he told a story about doing various repair

20 work or paying for repair work, I think, and putting

21 in a skylight; do you remember that?

22        MS. YOUNG:  Objection, Your Honor.  Misstates

23 testimony.

24        THE COURT:  I remember a skylight.

25        MS. YOUNG:  Paid for, but not did the work

25-80038-FPC   Doc 24-8   Filed 12/29/25   Entered 12/29/25 21:52:50   Pg 20 of 102

```
 1   put in.
 2           MR. MENSIK:  Okay.  Paid for a skylight.
 3           MS. YOUNG:  Thank you.
 4       Q.  (BY MR. MENSIK)  Do you remember the
 5   testimony about paying for a skylight?
 6       A.  Yes.
 7       Q.  Why don't you tell me the story about the
 8   skylight and these repairs.
 9       A.  Well, we were -- around that time, we were
10   kind of getting talked into moving again.  And there
11   had to be some things that we wanted to do to the
12   house, and so his family lived over --
13       Q.  Who is "his"?
14       A.  Eric.  His family was from -- his brothers
15   lived in Santa Rosa, which was not very far from where
16   we lived.  And he had contacted one of the brothers in
17   Kingdom Hall and had him come over to our place
18   because we wanted to put a skylight in, in the
19   hallway.
20       Q.  Okay.  And who paid for that skylight?
21       A.  We did.
22       Q.  Okay.  Let's talk about Texas.  Second --
23   second go-around, okay?  So I stopped you, and I
24   apologize.  But explain to me why you go down to Texas
25   in 2016.
```

25-80038-FPC   Doc 24-8   Filed 12/29/25   Entered 12/29/25 21:52:50   Pg 21 of 102

1     A.   We went down there because when we left the
2   first time, we had stuff in storage, and we didn't get
3   to take it with us.  And so we went back there, and we
4   were going to bring that back.  Got it -- we were
5   going to bring it back, and we were going to go from
6   there up to where we're living now, actually, Baker
7   City, Oregon.
8     Q.   Okay.  And what did you -- when you drove
9   down to Texas, did you have a trailer?
10     A.   No.
11     Q.   Okay.  How were you going to bring that stuff
12   back?
13     A.   We rented a truck.
14     Q.   Now, do you see -- when you go down to Texas,
15   do you ultimately end up seeing the defendants down
16   there?
17     A.   Unfortunately, yes.
18     Q.   All right.  Tell me about that.
19          THE COURT:  I'm sorry.  I lost track of -- is
20   this 2019?
21          MR. MENSIK:  2016.  I'm so sorry, Your Honor.
22     Q.   (BY MR. MENSIK)  So 2016, you go down.  Tell
23   me about the decision to see the defendants.
24     A.   Well, we just stopped by to say hello, and
25   they saw we were there.  And we got talked into

25-80038-FPC    Doc 24-8    Filed 12/29/25    Entered 12/29/25 21:52:50    Pg 22 of 102

```
 1   staying there.
 2        Q.   Was it your intention when you went down to
 3   Texas to stay there?
 4        A.   Absolutely not.
 5        Q.   Now, what month, approximately, did you show
 6   up in Texas?
 7        A.   In June.
 8        Q.   Okay.  And you show up in June.  You visit
 9   the defendants.  I mean, did they say anything that
10   got you to stay there?
11        A.   Mhm.
12        Q.   What did they say?
13        A.   A lot.  Oh, they wanted us to be able to stay
14   there to be around the grandson.  He needed his
15   grandma and grandpa.  And that if we stayed there, you
16   know, that they could help take care of us because we
17   were getting older, and we could have a relationship
18   with the grandson, and we would be able to be there
19   with them.  And we bought it.
20        Q.   So you show up in June of 2000 --
21   approximately June of 2016.  I want you to open up the
22   black book.  It's right in front of you, actually.
23   It's already open.
24        A.   Mhm.
25        Q.   And I want you to go to Exhibit 1.
```

25-80038-FPC    Doc 24-8    Filed 12/29/25    Entered 12/29/25 21:52:50    Pg 23 of 102

```
 1           MR. MENSIK:  Can you get the tech up, please?
 2   I apologize.  Thank you.
 3           THE WITNESS:  Yes.
 4       Q.  (BY MR. MENSIK)  All right.  So what you have
 5   in front of you is -- we've talked about this, and I
 6   can just kind of summarize so I don't waste the
 7   Court's time.  But this is a promissory note that's
 8   signed by Eric Young and also you and Ted Cole, right?
 9       A.  Mhm.
10       Q.  And you guys signed it on the 14th day of
11   June, 2016?
12       A.  Right.
13       Q.  And at this time, did you and Ted give $6,800
14   to Eric Young?
15       A.  Yes.
16       Q.  Do you remember why you gave him $6,800?
17       A.  Well, he found out that Ted had about that
18   much money from -- that he had saved from working over
19   in Taft when we lived in Taft.
20       Q.  Well, did -- oh, go ahead.  I didn't mean to
21   cut you off.
22       A.  There -- he wanted -- he needed the money --
23   I don't remember exactly what he needed the money for.
24   He wanted the money.  It was a loan.  It was supposed
25   to be a loan, a short-term loan.
```

25-80038-FPC   Doc 24-8   Filed 12/29/25   Entered 12/29/25 21:52:50   Pg 24 of 102

1      Q.   And do you remember any conversations at all

2   about issues with taxes in 2016?

3      A.   Oh, yes.   They were behind in their taxes.

4      Q.   Now, I want to talk about this note.   It

5   says, "Payable within 60 days."   Do you remember that?

6      A.   Yes.

7      Q.   Did the Youngs pay this note back within 60

8   days?

9      A.   No.

10      Q.   How long did it take for them to pay this

11   note back?

12      A.   Well --

13      Q.   You can turn the page.

14      A.   Just after they had come back up and got in

15   touch with us here lately.   November the 14th, 2022.

16      Q.   So if my math holds, it's close to six and a

17   half years?

18      A.   Correct.

19      Q.   In that time, when you stayed down in Texas

20   -- this is 2016 -- did you say that you stayed down

21   there for a year?

22      A.   In -- in Texas?

23      Q.   For that -- that time?

24      A.   At that time, yes.   We were there for about a

25   year.

1     Q.  Okay.  And who -- where did you live when you

2  were down there for that year?

3     A.  We were in an upstairs bedroom that used to

4  be their son's play room area.

5     Q.  Okay.  And that's where you and Ted were

6  living?

7     A.  Mhm.

8     Q.  Now, what was -- what was it like, living

9  with the Youngs during that period of time?

10     A.  It was very different than our lifestyle.

11     Q.  Okay.  Now, did you have any job duties or

12  anything like that when you lived there?

13     A.  Well, yes.  Mhm.  Yeah.

14     Q.  Okay.  Why don't you talk about those.

15     A.  I always went down, and I cleaned up the

16  kitchen -- always got the kitchen cleaned up.  I did

17  the vacuuming, and I did the dusting and all that.  Of

18  course, we took care of our own clothes and things

19  like that.

20     Q.  Okay.  Did you contribute anything to the

21  household, as far as money?

22     A.  Yes.  Yes, we did.

23     Q.  What did you contribute?

24     A.  We contributed -- well, we bought groceries

25  and so on and so forth.  And then after a while, we

25-80038-FPC   Doc 24-8   Filed 12/29/25   Entered 12/29/25 21:52:50   Pg 26 of 102

1    had a little family conversation, and -- with them.

2    And then we were told that we needed to -- we needed

3    to start giving a little bit more money to them.

4        Q.   Okay.  And was there any discussions about

5    the amount of money, if you recall?

6        A.   Mhm.

7        Q.   And what do you recall about that?

8        A.   Well, they wanted more money.  They wanted

9    for us to stay there.  We had a lot of different

10   things that happened when we first stayed there, too.

11   For instance, my husband -- he was not allowed to park

12   his truck there.  We had to take it and put it over in

13   the storage unit.  And there was just a lot of other

14   issues that came up, which, naturally, are going to

15   come up.

16       Q.   You and Ted ultimately leave Texas, right?

17   You no longer live there?

18       A.   Oh, yes.

19       Q.   And you left in 2017?

20       A.   Mhm.

21       Q.   I think it was Mr. Young that testified

22   that -- that you and Ted left because there was a

23   conversation about guns and gun safety or storage, and

24   you two got upset and left because of that.

25       A.   Mhm.

25-80038-FPC    Doc 24-8    Filed 12/29/25    Entered 12/29/25 21:52:50    Pg 27 of 102

1    Q.   Is that true?

2    A.   Yes.   Part of -- that's part of it, yeah, why

3   we had left.   About the guns and the gun safety, there

4   was no issue about that to begin with.

5    Q.   Okay.   Well, what about the guns and the

6   things like that -- that was part of the reason why

7   you left?

8    A.   Well, the guns -- they were -- what they had

9   just talked about a little while ago about the guns.

10   The guns -- we're very well aware of guns and gun

11   safety.   You know, like you said, we had been to a lot

12   of classes and so on and so forth.   He worked with the

13   sheriff's department.   He knows all about that.   I

14   took a class in -- about guns for myself when I was

15   working in the -- at the Del Taco restaurant years and

16   years ago.

17    And those -- those guns were not on their

18   property.   They were in our truck that had to be moved

19   off the property.   And they were in the box, locked

20   box in the property at the -- in his truck.

21    Q.   Okay.   So they weren't on -- they weren't on

22   their property?

23    A.   No.   But I will tell you that their son was

24   very involved -- enthralled with guns.

25    Q.   Okay.   Now, let me ask you this.   You

25-80038-FPC    Doc 24-8    Filed 12/29/25    Entered 12/29/25 21:52:50    Pg 28 of 102

1   ultimately left Texas --

2       A.   Mhm.

3       Q.   -- right?  And living with the defendants.

4   Why did you leave?  You gotta answer truthfully.

5       A.   Well, we weren't going to be giving over our

6   Social Security checks or anything like that to

7   somebody, and we decided that we wanted our life back.

8   So we left.

9       Q.   What do you mean by getting your life back?

10      A.   We didn't want to be under restrictive rules

11  that you had to do this and you had to do that.  You

12  know, we just wanted to be ourselves and have our

13  lifestyle back again.

14      Q.   When you talk about your Social Security,

15  handing that over, what do you mean?

16      A.   That was the scary thing.

17      Q.   Well, talk about it.

18      A.   Well, that was about the only income that we

19  had coming in.  We didn't want to give that away.

20      Q.   Okay.  Did anybody ask you to give that to

21  them or turn some of that over?

22      A.   Yes.  There was -- there was some discussion

23  about that.  Mhm.  And we both -- it was like a red --

24      Q.   When you say "we" --

25      A.   Ted and I.  It was like red flags going up,

1    and we knew that we had to start making some decisions

2    about what we were going to do.

3        Q.  So I want to talk about when you left Texas.

4    What do you remember about that -- that final

5    interactions when you were leaving?

6        A.  Well, we knew that they were going to have a

7    big fuss about it.  We didn't want that.  So we just

8    wanted some peace, and we wanted to get our things and

9    go.

10       So this Jackie Kapanski that she was talking

11   about -- she was one of the sisters in our

12   congregation.  And we were very close.  And so she

13   helped us to get some of our heavier things down, and

14   we were loading up things, and we had left a few

15   things upstairs because we were going to bring those

16   down later.  And he had gone out for a surgery, so --

17       Q.  Who's "he"?

18       A.  Eric had gone for a surgery that day.  So we

19   went ahead and took the things out of the house that

20   we could, put them in the car.  And we were going to

21   take the rest of the things and put them in a trailer

22   that we had.

23       When we came back -- because we were over at her

24   house that night -- when we came back to get our

25   stuff, it was not in our room.  It was all ready

25-80038-FPC    Doc 24-8    Filed 12/29/25    Entered 12/29/25 21:52:50    Pg 30 of 102

1   downstairs.  Everything.

2       Q.  Was there a physical interaction between you

3   and Susan Young that day?

4       A.  Oh, yes.  She was very upset that we were

5   leaving.  She didn't like it at all.  And she came out

6   to the car and was very verbally abusive and hollering

7   and screaming at us, and she just couldn't hold back

8   her anger, and she slapped me across the face.

9       Q.  Did she do anything else?

10      A.  Yes.  She had a -- we didn't notice at first,

11  but she had a -- something in her hand, and she was

12  scraping something off the window.  And I thought,

13  what is she doing?  You know, and I turned around, and

14  I looked, and I told Ted -- I said, she's scraping off

15  our stickers on your car.

16      So, you know, I guess she -- they thought we were

17  going to be coming back into Bentwater.  When we left

18  there, we would have taken them off ourselves and

19  gone.  But I thought, why is she doing that?  It's not

20  her car.  It's not her right to do that.  She was very

21  angry, and it was her way of telling us she didn't

22  want us to come back.

23      Q.  So you left Baker City -- or so you left

24  Texas that time?

25      A.  Mhm.

25-80038-FPC   Doc 24-8   Filed 12/29/25   Entered 12/29/25 21:52:50   Pg 31 of 102

1     Q.  And you headed up to where?

2     A.  We went to Baker City at that time.  That was

3 where we were going to go when we were -- had all of

4 our stuff packed up and ready to go.

5     Q.  And when you went to Baker City, who did you

6 live with?

7     A.  We lived with the folks that we rented from

8 over in Taft.  They wanted us to come up there with

9 them, and Ted has always wanted to go to Oregon.  But

10 we had gone out there to get our things, and we were

11 going to go back up there.  So that's why we left from

12 there and went right to there.

13     Q.  Now, you get there in Baker City in 2017.

14 And then you don't -- and I just kind of put this --

15 we -- I want to actually draw your attention -- well,

16 let's not go there first.  So 2017, you get to Baker

17 City.

18     A.  Mhm.

19     Q.  I want to talk about this inheritance that

20 Ted got.

21     A.  Mhm.

22     Q.  Who is Jeannie Hochuli?

23     A.  That's Ted's mom.

24     Q.  And she passed away in 2019?

25     A.  2019.  Mhm.  I was working at the hospital at

25-80038-FPC   Doc 24-8   Filed 12/29/25   Entered 12/29/25 21:52:50   Pg 32 of 102

the time.  And I got a call one day at the hospital,
and they told me -- the people who called told me that
they had her in the hospital up there, and she wanted
to go home, but she couldn't go home because she was
96 years old.  And they were going to release her to
home with nobody there.  And so I told the hospital,
let me go.  They said I had, like, three months time I
could go, and I didn't know that, and that was really
wonderful.

So immediately, we got in the car, and we drove up
there because they were having a hearing the next day.
And this is -- like, I had just worked a morning
shift, and I was getting ready to get off.  So we got
in the car.  We got everything we needed, and we drove
up there, and we got up there to Porterville,
California from where we were 15 minutes before they
had the meeting.

Q.  Well, let me let me go to this to save time.
How much money did Ted receive in inheritance from
Jeannie?

A.  About a million dollars.

Q.  Okay.  Was it a little more, or do you
remember the exact amount?

A.  A little bit more.  Mhm.

Q.  And when did Ted receive that money?

1      A.   It was around -- when he actually got it, it

2  was around -- I think it was in January.  January,

3  February, somewhere around there.

4      Q.   Of 2020?

5      A.   Of 2020.  Mhm.

6      Q.   Because then you guys bought a house after

7  that.

8      A.   Right.  Mhm.

9      Q.   And how long after the money was received

10 before you bought that house?

11     A.   About a month -- a month or a month and a

12 half.

13     Q.   So early 2020?

14     A.   Yeah.  Mhm.

15     Q.   Now, those were -- it was Ted's inheritance.

16 But with regards to that inheritance, how do you and

17 Ted treat that money?

18     A.   Everything he has is mine, and everything I

19 have is his.  We're together.  We're married.

20     Q.   That house that you purchased in Baker

21 City -- are you both on the title?

22     A.   Oh, absolutely.

23     Q.   And is it important to be on the title of

24 that house?

25     A.   Absolutely.

25-80038-FPC   Doc 24-8   Filed 12/29/25   Entered 12/29/25 21:52:50   Pg 34 of 102

1    Q.   Have you ever bought a house that you're not
2 on the title of?

3    A.   Never.

4    Q.   Did you ever speak to the defendants at any
5 point in time about the fact that Ted may receive an
6 inheritance from Jeannie?

7    A.   Yes.  When we were --

8    Q.   What's the approximate year?

9    A.   Pardon?

10    Q.   The approximate year of this conversation.

11    A.   About 2020 -- somewhere around there, I
12 think, in 2021 somewhere.

13    Q.   Well, no.  I'm talking about in the past, not
14 after the inheritance.

15    A.   Oh, in the past.  Oh, yes.  In the past.
16 They knew that -- that his dad was going to be leaving
17 him money when he died, but he didn't get it at that
18 time.

19    Q.   So there's a lot of "he's" there, and I just
20 want to make it clean for the record.

21    A.   His dad.

22    Q.   So Ted's dad?

23    A.   It's his stepdad, actually, not his
24 biological dad.

25    Q.   When his stepdad died, did Ted get anything?

1       A.   No.

2       Q.   What happened with that?

3       A.   His mom held onto it.

4       Q.   And so his mom is Jeannie?

5       A.   Yes.

6       Q.   So when Jeannie passed away in 2019, that

7  inheritance came to Ted?

8       A.   Correct.

9       Q.   I want to go to Exhibit -- just this last

10  exhibit to leave the Court on, Exhibit 2.

11       A.   In this book?

12       Q.   Yes.  This is a text from Susan to you dated

13  March 29th, 2020.  Do you see that?

14       A.   Yes.

15       Q.   It says, "Mom, I don't know if this is still

16  your number or not, but trying to reach you."  Do you

17  see that?

18       A.   Yes.

19       Q.   What do you recall about communications with

20  Susan just, like, between -- when you left Texas in

21  2017 and the date of this text message, which is March

22  29th, 2020?

23       A.   Never heard from her or saw her.

24       Q.   Well, did she send you any text messages at

25  all?

25-80038-FPC   Doc 24-8   Filed 12/29/25   Entered 12/29/25 21:52:50   Pg 36 of 102

 1          MS. YOUNG:  Objection, leading the witness.

 2          THE COURT:  That's not leading.

 3          MS. YOUNG:  Okay.  Sorry.

 4          THE WITNESS:  I have this one right here from

 5     her.

 6     Q.   (BY MR. MENSIK)  Okay.  And do you recall --

 7     if you can't recall, do you remember if she sent you

 8     any text messages at all?

 9     A.   When we left there and to here?  No.

10          MR. MENSIK:  All right.  Your Honor, I don't

11     know if that's a good place for me to stop, or --

12          THE COURT:  Oh, gosh.  Yes.  I lost track of

13     time.

14          MR. MENSIK:  I apologize.  I went a little

15     long.

16          THE COURT:  Okay.  I have a clarifying

17     question, if you don't mind me asking.

18          MR. MENSIK:  Yes.  Absolutely, Your Honor.

19          THE COURT:  The conversation about signing

20     the Social Security over when you were in Texas -- I

21     don't understand -- I don't fully understand what your

22     testimony is in regard to that.  Somebody asked you to

23     sign over your Social Security?

24          THE WITNESS:  They wanted us to give them the

25     Social Security.  Mhm.

25-80038-FPC    Doc 24-8    Filed 12/29/25    Entered 12/29/25 21:52:50    Pg 37 of 102

```
 1            THE COURT:  And who is "they"?
 2            THE WITNESS:  Eric.  The Youngs.
 3            MR. MENSIK:  Well, can I ask --
 4            THE COURT:  Yes.
 5       Q.  (BY MR. MENSIK)  Was it actually signing over
 6   the Social Security, or was it just giving them --
 7       A.  They wanted us to give them the money from
 8   our Social Security.  Mhm.  At that time.
 9       Q.  Not an actual signing over?
10       A.  No.  Uh-uh.
11            THE COURT:  Thank you.  Okay.  We will
12   adjourn for the day.  We'll start back up with
13   Ms. Cole's direct when we get back.
14            For time purposes, the Coles have 3 hours and
15   13 minutes left in their -- that includes closing.
16            MR. MENSIK:  Yes, Your Honor.
17            THE COURT:  The Youngs have 6 hours and 2
18   minutes left, okay?
19            Tomorrow, we'll start at 8:30.  We will plan
20   on then starting again at 1 o'clock.  And then
21   remember, Thursday we only have 9 to noon, okay?
22            MR. MENSIK:  Yes, Your Honor.
23            THE COURT:  Okay.  We'll be adjourned.  You
24   can leave your stuff here if you would like.  I'm
25   going to clean up my desk, so feel free to clean up
```

25-80038-FPC   Doc 24-8   Filed 12/29/25   Entered 12/29/25 21:52:50   Pg 38 of 102

1  and leave if you would like.  You can go ahead and

2  step down.

3          (Court adjourned at 4:34 p.m.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Linda and Ted Cole v. Eric and Susan Young
Trial - Volume II of II

1        (January 15, 2025.  8:33 a.m.)

2        THE COURT:  Anything we need to discuss

3   before we start?

4        MR. MENSIK:  Your Honor, one thing.  We

5   didn't get a copy of the motion that was made

6   yesterday morning by the defendants.  I'm just -- for

7   the record, we never received one.

8        MR. YOUNG:  I can get you one in a minute.

9        MR. MENSIK:  I just wanted to let you know

10  that.

11       THE COURT:  Okay.  Make sure they get a copy

12  of that motion, please.

13       MS. YOUNG:  Okay.

14       THE COURT:  Anything else?

15       MR. YOUNG:  Not from me, Your Honor.

16       MR. MENSIK:  Nothing from the plaintiff, Your

17  Honor.

18       THE COURT:  Are we going to start back up

19  with Ms. Cole's testimony?

20       MR. MENSIK:  Yes, Your Honor.

21       THE COURT:  Ms. Cole, go ahead and come up.

22       Ms. Cole, I'm going to swear you in again,

23  since it's a new day.  Do you affirm and attest that

24  the testimony you are about to give is the truth?

25       THE WITNESS:  Yes.

25-80038-FPC   Doc 24-8   Filed 12/29/25   Entered 12/29/25 21:52:50   Pg 40 of 102

1           THE COURT:  Okay.  Thank you.

2                D I R E C T   E X A M I N A T I O N

3   BY MR. MENSIK:

4       Q.   Ms. Cole, I want to go back to Exhibit 2, the

5   black binder.  Mhm.

6           MR. MENSIK:  Could we get the tech?

7       Q.   (BY MR. MENSIK)  Okay.  And ma'am, I just

8   wanted to ask you yesterday to clean up something.

9   This -- this text message was sent on March 29th,

10  2020.  Had you -- had you received a couple of text

11  messages from Ms. Young in the years prior to this?

12      A.   This is on the page -- on the number 1?

13      Q.   Yeah, this is -- yeah, number 1.

14      A.   Have I received anything --

15      Q.   Well, in the couple years prior to this -- so

16  this text was dated March 29th, 2020.

17      A.   Mhm.

18      Q.   And I just -- in the couple of years prior to

19  this, had you received a couple of text messages from

20  Ms. Young?

21      A.   No, not that I recall.

22      Q.   All right.  Okay.  I want to talk about --

23      A.   Could I say something?

24      Q.   Oh --

25      A.   I'm sorry.  She had been trying to reach out

1  to me with text messages from time to time, and I
2  never answered anything.
3      Q.  Okay.  So just to be clear for the record,
4  can you say that again?
5      A.  She was trying to reach out to me with text
6  messages, but I never responded to her.
7      Q.  Do you remember about how many text messages?
8      A.  There were several.  I can't remember how
9  many, exactly, but there were several.
10      Q.  Okay.  And did you respond to those?
11      A.  No.
12      Q.  All right.  After this text message here, did
13  you have more or less communications with Ms. Young?
14      A.  This was when she was telling me about my
15  sisters, and it just started trickling -- a trickling
16  down effect.  She started texting a little more, a
17  little more, a little more.
18      Q.  So your communications with Ms. Young
19  increased after this text message?
20      A.  Yes.
21      Q.  I want you to go to Exhibit 3.  Are you
22  there?
23      A.  Yes.
24      Q.  Okay.  Now, this is a text message -- is this
25  a text message from Susan to you?

25-80038-FPC    Doc 24-8    Filed 12/29/25    Entered 12/29/25 21:52:50    Pg 42 of 102

1    A.   Yes.

2    Q.   All right.  I'm going to read you some

3  portions of this.  It says -- first portion of this on

4  page 1.  It says, "Well, I'm trying to not stress.

5  Eric lost his job with Verizon.  They reorged his

6  business unit, shuffled his manager, and reduced the

7  head count.  I'm trying not to panic."

8    And then it says, "It took us the better part of a

9  year to catch up our mortgage and past due bills, and

10  now this."

11    Page 3 says, "I'm torn between going out and job

12  hunting and leaving J to do his homeschool on his own

13  and hope I don't bring back COVID into the house or

14  hang on and see what leads Eric can turn up."

15    And then on page 4, it says, "And on top of that,

16  they haven't even paid Eric his final check.  I have

17  to pay the mortgage, and I check every day, and

18  nothing has shown up yet.  I can't believe this.  Just

19  seriously."

20    Now this goes on, this exchange.  But what did you

21  understand, if anything, was being conveyed to you in

22  this message from Ms. Young?

23    A.   I thought she was trying to be very tactful,

24  in a sly way, that she was asking for money, for us to

25  help them.

25-80038-FPC   Doc 24-8   Filed 12/29/25   Entered 12/29/25 21:52:50   Pg 43 of 102

```
 1       Q.   Did you give the Youngs any money in response
 2  to this text message?
 3       A.   Absolutely not.
 4       Q.   In 2021 -- 2021, had the Youngs paid you back
 5  for that $6,800 that they owed?
 6       A.   No, they did not.
 7       Q.   I want you to go to Exhibit 2.
 8       A.   Is that in -- in the 2?  No. 2?
 9       Q.   Yeah, Exhibit 2.
10       A.   Yes.
11       Q.   And then I want you to go to page 5 of it.
12       A.   Mhm.
13       Q.   Now, this text message is a text message
14  dated September 29th, 2021; do you see that?
15       A.   Yes.
16       Q.   And this is a text message from Susan to you,
17  correct?
18       A.   Yes.
19       Q.   Now, it starts out, "Mom, I'm getting
20  worried.  I've been following the news, and we know
21  we're at the end, and things are going to get even
22  worse.  If the U.S. defaults, the stock market is
23  going to get wiped out, and it's going to set off a
24  global chain reaction, making even more hardship for
25  everyone."  And that goes on to the second page.
```

25-80038-FPC   Doc 24-8   Filed 12/29/25   Entered 12/29/25 21:52:50   Pg 44 of 102

1        And then on page -- or sorry, it was page 6.  On

2   page 7, Susan says, "I don't want to put you on the

3   spot by calling, so I'm just going to say it this way.

4   Would you and Dad be willing, if you can, to

5   consider -- ugh, this is awkward."

6        And then she says, "I'm worried about keeping a

7   roof over Jaeger's head as this system goes down the

8   drain."

9        And then on page 8 -- well, let's go to page 9,

10  kind of cut to the chase.  Middle of the page, she

11  says, "I just checked, and our mortgage sits at 216K.

12  If you can do so and if you want to do so, if that is

13  something you could manage while the stock market is

14  still afloat, it would be a huge weight off to know

15  Jaeger would have a roof, no matter what's about to

16  happen."  Do you see that?

17       A.  Yes.

18       Q.  Okay.  Did you interpret this as a request

19  for the Youngs -- for you to pay off the Youngs'

20  mortgage?

21       A.  That's absolutely what it states, yes.

22       Q.  Did you respond to this text message?  Or did

23  you respond specifically to this request for 200 --

24  for this -- this request for you to give them

25  $216,000?

Linda and Ted Cole v. Eric and Susan Young
Trial - Volume II of II

1     A.  No.

2     Q.  So in response to this, is it accurate to say

3 that you did not give them $216,000?

4     A.  No, I did not.

5     Q.  And why not?

6     A.  They didn't have that -- they owed us money,

7 and we're going to -- they expect us to pay off their

8 entire mortgage?  I thought it was absolutely

9 incredible she even asked that.  That's something you

10 just would never ask anybody to do.

11     Q.  Now, do you remember the year that Susan and

12 Eric moved to Spokane, approximately?

13     A.  Around 2020 or '21.

14     Q.  Now, during that time, when -- let's go to

15 2022.  How much communication are you having with

16 Susan during that time period?

17     A.  We were having more because she was up in the

18 Spokane area at that time.

19     Q.  Okay.  How was your relationship at that time

20 with Susan?

21     A.  Well, we thought that they had done some

22 growing up.  We were hoping that they had.  And so we

23 were communicating with them.  And at some point -- we

24 hadn't seen them yet, but then later they came -- she

25 came down with my grandson to visit.

25-80038-FPC    Doc 24-8    Filed 12/29/25    Entered 12/29/25 21:52:50    Pg 46 of 102

1     Q.   And when did she -- when you say "she," are

2  you talking about Susan?

3     A.   Susan.

4     Q.   And when did Susan come down with your

5  grandson to visit?

6     A.   I believe it was in September of 20 -- '22?

7     Q.   These conversations in 2022 -- what, if

8  anything, did Ms. Young talk to you about with regards

9  to moving to Spokane?

10     A.   Well, they were using the grandson as -- you

11  know, the -- the reason why we should be thinking

12  about that and getting closer to -- getting closer to

13  them, because he was getting older, and we needed to

14  have a relationship with him -- and that they wanted

15  us to be able to have more care, because they felt

16  that where we were living, we weren't getting good

17  care medically -- they wanted us to be up there where

18  there was a lot of, I guess, more important doctors

19  that we could see.

20     Q.   Did you -- so in September of 2022, I think

21  it's your testimony that Susan and Jaeger came down to

22  visit you and Ted in Baker City; is that right?

23     A.   Yes.

24     Q.   Did you then go up to Spokane?

25     A.   Yes.  We did later.  Uh-huh.

1    Q.   And what did you do up in Spokane with Susan?

2    A.   Oh, we got the tour of the city, taking us

3  everywhere and showing us this and showing us that,

4  you know, everything that there was available up there

5  and kind of trying to entice us to go up there.  It

6  was better than where we were.

7    Q.   And did that get you interested in moving up

8  to Spokane?

9    A.   It gave us some thought, but we were still

10  building on our house, and it was like that would be

11  just interrupting our whole life at the time.  But she

12  continued on.

13    Q.   Now, in 2022, do you remember -- it was your

14  testimony earlier about Eric coming down and fixing

15  the water heater; do you remember that?

16    A.   Yes.

17    Q.   Okay.  What do you remember about that?

18    A.   Well, we called.  We had a problem with the

19  water heater.  And it was the original one that was in

20  the house.  We bought it, and it had gone out.  And so

21  I called around to the plumbers to try to see if we

22  could get somebody to come out.  I was informed there

23  wasn't anybody available for at least another month.

24  So you really can't be without hot water or anything,

25  so I had let them know we had a problem.  And then

1    next thing I know, Eric was volunteering to come up

2    and take care of the water heater and install a new

3    one.

4         Q.   And he came down and did that?

5         A.   Yes.

6         Q.   And what did you think about that?

7         A.   Well, the water heater that we had was an

8    existing water heater that was inside of, like, a

9    little storage area where you put canned goods or

10   whatever, you know.  The very first one, original one

11   that was in there actually went through the floor.

12   It's still down there today.

13        Then they put the second one in there.  That's the

14   one that went out.  So we thought it was an unusual

15   place to have it because we've always had hot water

16   heaters in the garage.  So when he came, he took that

17   one out, shut it off, and he installed one in our

18   garage.

19        Q.   Were you appreciative of that?

20        A.   Oh, very much, yes.  I thought it was very

21   kind for him to do that.

22        Q.   Now, it's kind of a silly question, but does

23   one of -- after Eric did his work, does one of your

24   toilets actually have hot water running to it?

25        A.   Yes.

```
 1        Q.   And it was some testimony yesterday from
 2   Mr. Young, I believe, that said he had never heard
 3   anything about this, you know, this fact that this
 4   toilet has hot water running to it.  Did you ever tell
 5   him?  Did you ever tell Eric -- or did you or Ted ever
 6   tell Eric that that toilet had hot water running to
 7   it?
 8        A.   You know, I'm not sure if we mentioned that
 9   to him later.  I don't think we did, because we were
10   not having communication with them.  But we did have a
11   friend come out and look at the situation, and they
12   said, well, we're going to have to get the pipes all
13   checked out and see what happened where he had hooked
14   up the pipes.
15        Q.   Okay.  I want to go to Exhibit 1.  Are you
16   there, ma'am?
17        A.   Yes.
18        Q.   Now, Exhibit 1, I want to go to page 2.
19        A.   Mhm.
20        Q.   Ma'am, what are you looking at here?
21        A.   I'm looking at a payment that they gave to
22   Ted and myself for money that they had owed since --
23   for many years.
24        Q.   Okay.  What's the date of that check?
25        A.   November the 14th of 2022.
```

25-80038-FPC   Doc 24-8   Filed 12/29/25   Entered 12/29/25 21:52:50   Pg 50 of 102

1  Q. And is this the repayment check for the funds
2 that were loaned to the Youngs in 2016?

3  A. Correct.

4  Q. Do you remember how you received this check?

5  A. This check?

6  Q. Yes.

7  A. I believe Susanann gave us this check.

8  Q. Okay.  When you received this check, what was
9 your reaction?

10  A. Well, we were surprised.  We had kind of
11 forgotten about it because we figured it was written
12 off.

13  Q. Okay.  I want to talk about the Severns for a
14 little bit.  Who are -- who are the Severns?

15  A. They're very dear friends of ours.

16  Q. And they're -- it's Mark and Joell?

17  A. Yes.

18  Q. And up until recently, they had a son named
19 Damian, correct?

20  A. Yes.

21  Q. All right.  How long have you known Mark and
22 Joell for?

23  A. Since 2017.

24  Q. And -- and if you know, how long has Ted
25 known either Mark or Joell?

25-80038-FPC Doc 24-8 Filed 12/29/25 Entered 12/29/25 21:52:50 Pg 51 of 102

1      A.  The same time period, 2017.

2      Q.  In 2022, what was your relationship like with

3 the Severns?

4      A.  Very good.  It's always been very good.

5      Q.  Okay.  And with regards to -- to Damian, did

6 you refer to him as your grandson?

7      A.  Absolutely.

8      Q.  Did you refer to him as your grandson in

9 front of the -- in front of the Coles?  Or not the

10 Coles.  The Youngs, rather.

11      A.  Yes.  Mhm.

12      Q.  Based upon conversations and your experience,

13 did the Youngs know about your relationship with the

14 Severns?

15      A.  Yes.  They knew that we were close with them.

16 Mhm.

17      Q.  Did you get a sense, through any actions,

18 that the Youngs were jealous of the Severns?

19      A.  Very.  Very quickly.

20      Q.  In 2021, 2022, who did you and Ted name as

21 beneficiaries on your will?

22      A.  The Severns.

23      Q.  That changed; is that right?

24      A.  Mhm.

25      Q.  Who did that change to?

25-80038-FPC   Doc 24-8   Filed 12/29/25   Entered 12/29/25 21:52:50   Pg 52 of 102

1      A.   It changed to the Youngs.

2      Q.   And when did that change, if you remember?

3      A.   It was around -- somewhere in '22, I believe.

4      Q.   Do you remember why you changed your will?

5      A.   Because we were being talked into going up to

6   Spokane and making plans to be up there, so --

7      Q.   When you say "talked into," who are you

8   talking with?

9      A.   The Youngs talked us into going up there.

10   They were making pathways for us to be up there in

11   every way I can think of.  And so we decided that,

12   well, if we're going to be up there, then we might as

13   well change it, although we didn't really want to, but

14   we did.

15      Q.   Did the Youngs talk to you about changing

16   your will?

17      A.   No.

18      Q.   Okay.  I want to talk to you about the

19   purchase of the lot in Spokane.  What do you recall

20   about the purchase of this lot?

21      A.   My daughter called me up and was telling me

22   about a lot that was available, that we needed to look

23   at it.  Oh, it's just perfect.  It would be just

24   perfect for you guys to come up here and build a

25   house.

25-80038-FPC   Doc 24-8   Filed 12/29/25   Entered 12/29/25 21:52:50   Pg 53 of 102

```
 1        Q.  Now, there's been showing -- I think some
 2   text message showing that you had some interest in
 3   coming to Spokane.  Prior to seeing the lot or this
 4   discussion of the lot, were you interested in looking
 5   in the Spokane area for property?
 6        A.  Well, we talked about what we might do when
 7   we got up there.  We weren't sure.
 8        Q.  So let's go back to this lot.  With regards
 9   to this lot, did you ever visit this lot in person?
10        A.  No.
11        Q.  Okay.  When you purchased this lot, had you
12   seen it in person?
13        A.  No.
14        Q.  Who showed -- was this lot ever showed to you
15   in any manner at all?
16        A.  Oh, yes.  Yes.  She went out with her camera
17   and --
18        Q.  Who is "she"?
19        A.  Susan -- and videotaped the whole thing,
20   walked all the way around, showed us the area, what
21   the lot looked like.  And then she showed us the
22   surrounding area, this gorgeous home that's being
23   built across -- just right across -- in front of the
24   house where the house would be.  And the whole area up
25   there -- it's a very pretty area, very nice area.
```

Linda and Ted Cole v. Eric and Susan Young
Trial - Volume II of II

1    Beautiful home across the street.

2       Q.  From -- and did Susan say anything about this

3    lot, and -- and did she say anything else about --

4    what else did she say about the lot when she showed it

5    to you?

6       A.  She said, oh, Mom, this lot just came on the

7    market, she says, and it's going to go really fast.

8    It's in a good area.  It's in a gated area -- not

9    gated, but it's in a POA.  And she said, you guys

10    should -- you guys should come up and look at it, or,

11    you know, you should get it or look at it because it's

12    going to go really fast, really fast.  And it's the

13    only one there.

14       And it's very close to where Jaeger's bus stop

15    came through.  And I thought, well, I don't know why

16    that was mentioned.

17       Q.  But then based on that -- so based on these

18    conversations and some of these other things, did you

19    purchase that lot?

20       A.  Yes, we did.

21       Q.  How much was that lot?

22       A.  $179,000.

23       Q.  Were you on the title of that lot?

24       A.  Yes.

25       Q.  Was Ted on the title of that lot?

25-80038-FPC   Doc 24-8   Filed 12/29/25   Entered 12/29/25 21:52:50   Pg 55 of 102

1    A.  Yes.

2    Q.  I want to go to Exhibit 4.  Now, we've talked

3 about this -- this first page is a May 1st, 2023

4 check; do you see that?

5    A.  Yes.

6    Q.  This is $4,000, and it says "lost wages for

7 work."  Do you see that?

8    A.  Yes.

9    Q.  What do you remember -- and that's your

10 signature on the bottom right-hand corner of that

11 check, correct?

12    A.  Right.

13    Q.  What do you remember about writing this check

14 on May 1st, 2023?

15    A.  I was very shocked that this was asked of us.

16    Q.  Well, let's talk about this.

17    A.  Mhm.

18    Q.  So around May 1st, 2023, you've heard

19 testimony that Eric came down.  And I think you said

20 he was helping with the remodel.  What do you remember

21 about that?

22    A.  He came down, and he was he was supposed to

23 help us with trying to figure out the problem, the

24 issue with the trusses.  And seemed like where we were

25 at -- at Miller's, that they were having a hard time

25-80038-FPC   Doc 24-8   Filed 12/29/25   Entered 12/29/25 21:52:50   Pg 56 of 102

1  trying to figure it out -- the guys were, I should

2  say.  And then he stated that he had a lot of

3  experience with all that, and so he was going to go

4  over there.  We told him he can go there and ask them,

5  talk with them about the trusses.  And so he did.  He

6  went over there.

7      Q.  And did Eric come down to your place in Baker

8  City?

9      A.  Yes.

10      Q.  And how long was he at your house in Baker

11  City on that occasion?

12      A.  Not very long.  Maybe during the week.

13      Q.  And before Eric came down, did he tell you

14  that he was expecting to be paid for coming down and

15  helping out?

16      A.  No.

17      Q.  So walk me to the moment where you -- where

18  -- did Eric ask to be paid at some point?

19      A.  Oh, yes.

20      Q.  Walk me through that exact story.

21      A.  Yeah.  He had been up there with Joseph at

22  Miller's discussing all this, and then when he figured

23  that everything was all taken care of, that he was

24  going to go back home, and he needed to have us pay

25  him for his lost wages for that week.

25-80038-FPC    Doc 24-8    Filed 12/29/25    Entered 12/29/25 21:52:50    Pg 57 of 102

1      Q.  And that -- oh, sorry.  Go ahead.  You were
2 going to say something else.
3      A.  And we were kind of surprised because he had
4 his -- his -- all his stuff with him, and he was doing
5 his work at home so -- you know, afterward.  So we
6 were kind of puzzled.  Lost wages?  We couldn't figure
7 that out.
8      Q.  So he makes this ask of you.  What do you
9 then do?  Do you just get your checkbook?
10     A.  Well, we were very appreciative of what he
11 did.  We didn't want to seem like we were going to
12 take something for nothing.  So we gave him the money.
13     Q.  Okay.  Let's go to page 2 of this exhibit.
14 So we've got a check for $4,000 written on May 1st.
15 Now we have a check for -- on May 1st for $12,000.
16 And it says "Jaeger schooling, 2023 through 2024."  Do
17 you see that?
18     A.  Yes.
19     Q.  What do you recall about the circumstances
20 surrounding writing this check?
21     A.  They were telling us about how their -- their
22 -- financial problems and stuff and how tight their
23 money was and that, you know, he was coming down to
24 help us, and --
25     Q.  So "he" being Eric?

25-80038-FPC    Doc 24-8    Filed 12/29/25    Entered 12/29/25 21:52:50    Pg 58 of 102

```
 1        A.   Eric -- excuse me, yes -- was coming down to
 2   help us.  And so he was talking about the -- Jaeger's
 3   schooling, that they had him in the special school up
 4   there, and that they were behind on their payments.
 5   And so I thought, well, you know, we can help out, you
 6   know.  And I -- I told him.  I said I can write a
 7   check for you for, you know, a little bit to help out.
 8   I figured it would be, like, a thousand dollars.  I
 9   felt like that would be quite a bit.  And when I went
10   to write the check out, I said, okay.  I said, how
11   much would you need to -- for a little help?  $12,000.
12        Q.   What did you think when he said $12,000?
13        A.   I was glad I was sitting in a chair.
14        Q.   But you wrote the check?
15        A.   I did.
16        Q.   Why did you write the check?
17        A.   Well, it was my only grandson.  I knew they
18   were trying to keep him in this good school and
19   everything, and so I thought we'll be generous, and
20   we'll do this that one time.  That's it.
21        Q.   I want to talk to you about --
22        A.   Excuse me.
23        Q.   Oh, go ahead.
24        A.   I was kind of surprised later when I got to
25   realizing, this is May 1st.  He's getting out of
```

25-80038-FPC    Doc 24-8    Filed 12/29/25    Entered 12/29/25 21:52:50    Pg 59 of 102

1    school, you know, the next month.  And they needed
2    $12,000.  So -- didn't know how much the school cost,
3    but I figured they must not have been making payments
4    up to that time or something.
5         Q.   Okay.  Let me talk about kind of around this
6    same time period, right?  Did you start seeing doctors
7    up in Spokane?
8         A.   Oh, yes.
9         Q.   Who was making those appointments for you in
10   Spokane?
11        A.   Susan.
12        Q.   What kind of doctors was -- were you seeing
13   up in Spokane?
14        A.   Medical doctors, eye doctors, doctors for our
15   -- what do you call them?  For his breathing --
16        Q.   For Ted?
17        A.   Yes.  For Ted's breathing, because he was on
18   oxygen and everything.  And so we had to have special
19   doctors for that.  Just almost every doctor it seemed
20   like that we were seeing, we were being taken up
21   there.
22        Q.   And you lived -- at this time, May, June 2023
23   time frame, you live -- still live in Baker City,
24   correct?
25        A.   Oh, yes.

Linda and Ted Cole v. Eric and Susan Young
Trial - Volume II of II

1      Q.   And so you were coming up to Spokane

2  appointments to see doctors that Susan arranged?

3      A.   Mhm.  Five-hour trip one way, at least five

4  or six hours.  Mhm.

5      Q.   Now, in 2023, did you have any close friends

6  or family members pass away?

7      A.   2023, yes.

8      Q.   And who was that?

9      A.   We had a number of people who passed away in

10  '23.

11      Q.   Did your sister pass away?

12      A.   Well, since you're speaking of relatives, my

13  sister passed away.

14      Q.   Okay.  And then who's Jack?

15      A.   Jack Workman?

16      Q.   Yeah.

17      A.   That's our dear friend that we had known for

18  55 years, and he passed away, also.  He passed away --

19  my sister passed away one day, and he passed away the

20  next, and that was quite a blow.

21      Q.   Did the Youngs do anything after that for

22  you?

23      A.   Oh, yes.

24      Q.   What did they do?

25      A.   Well, when we came up to see them, we walked

25-80038-FPC   Doc 24-8   Filed 12/29/25   Entered 12/29/25 21:52:50   Pg 61 of 102

1   in the door, and strange things were happening.  She
2   wanted me to sit in a certain area, my husband sit in
3   a certain area.  And she had things kind of set up on
4   the coffee table, and I could tell Jaeger was acting
5   kind of -- not goofy, but he was excited about
6   something.
7       And so we kind of thought, well, what's going on?
8   You know.  And then Eric comes up from the basement,
9   and he's got his bathrobe or something draped across
10  him.  He's walking real slow.  And I thought, what is
11  he doing?  And he came up, and then they -- he opened
12  the top part of this to expose this little -- this
13  little pomeranian puppy.
14      Q.  And ma'am, you're emotional about this puppy.
15  And I'm not going to go into it, but --
16      A.  Well, it's because -- our dog we had for a
17  long time, 16 years -- she passed away.  And we
18  couldn't even look at another dog for 20 years without
19  crying because we were so attached to the dog.
20      Q.  Did the Youngs know about your attachment to
21  that dog?
22      A.  Absolutely.
23      Q.  So in the summer of 2023, they've got this
24  puppy for you?
25      A.  Yes.  They did.

25-80038-FPC   Doc 24-8   Filed 12/29/25   Entered 12/29/25 21:52:50   Pg 62 of 102

1      Q.   I want to change just a little bit and talk

2   about this -- this -- we've heard some kind of things,

3   testimony today about an evolving plan for you to --

4   you know, we got the -- you purchased the lot, right?

5   And then ultimately, you know -- we know what happens

6   in the middle of October 2023.

7      But I want to ask, in 2023, after you purchased

8   that lot, did you have any plans about what you were

9   going to do with it?

10      A.   Well, we were -- the lot was purchased in the

11   beginning to build a house on.  Then Susan was telling

12   us their problems of their rent being $3,000 a month.

13   And they had just raised it to $3,500 a month.  And I

14   was floored because I didn't know anybody paid that

15   much ever for rent.

16      And so Ted and I were thinking that maybe we could

17   help them out a little bit.  And so instead of

18   thinking of building something on that lot because it

19   was so huge, I thought we could put a duplex on there.

20   They could live on one side.  We would live on the

21   other because that way, they would be there close.  If

22   they wanted to help us, you know, as we got older,

23   they could.  It would be convenient for both of them.

24   They wouldn't have any problem with renting anything

25   or paying for anything.

25-80038-FPC   Doc 24-8   Filed 12/29/25   Entered 12/29/25 21:52:50      Pg 63 of 102

1       Q. And did you discuss that plan with the

2 Youngs?

3       A. Yes.

4       Q. Now, I want to talk about the end of

5 September of 2023. I mean, there's been some

6 testimony about you all moving up there. And what do

7 you remember about -- I understand that Eric brought

8 some of your stuff up from Baker City; do you remember

9 that?

10       A. Mhm.

11       Q. Okay. What do you remember about that

12 experience?

13       A. We felt it was very strange because they were

14 wanting to move our things up there, and we weren't

15 planning on moving anywhere until we had something up

16 there, you know, build something or whatever. Had to

17 fix our house and then sell it first. It was, like,

18 this rush, rush, rush plan. Every time we turned

19 around, it was something different. You know,

20 everything was changing, and we couldn't understand

21 what was going on.

22       Next thing I know that they're wanting to load up

23 the trailer and bring some of our stuff up there, and

24 I thought -- when they were getting things to move, I

25 thought, well, they're not taking our stuff. They're

25-80038-FPC   Doc 24-8   Filed 12/29/25   Entered 12/29/25 21:52:50   Pg 64 of 102

1   only taking certain things.  I couldn't understand
2   what was going on.  And then not only that, but when I
3   was taken up there, it was put in two different
4   storage units.
5       Q.   Well, let me ask you this.  This instance --
6   we're talking about this first instance.
7       A.   Mhm.
8       Q.   Did you accompany Mr. Young down there to get
9   your stuff?
10      A.   No.  He was there by himself at the house.
11      Q.   Okay.  And did you end up paying him for
12  moving your stuff?
13      A.   Yes.  With movers, mhm.
14      Q.   Now, after that, you also brought up some of
15  your own stuff?
16      A.   Yes.  That was when we brought up our travel
17  trailer.
18      Q.   Okay.  Now, at the time where Eric had gone
19  down and was moving some of your stuff up -- right?
20  You were living with the -- you were staying with the
21  Youngs.
22      A.   Staying with the Youngs, yes -- never living,
23  just staying.
24      Q.   And you didn't have a house built, right?
25      A.   No.

1    Q.   You didn't have that duplex built?

2    A.   No.

3    Q.   Now, I want to ask you, with regards to that

4  plan for the duplex we talked about, did Eric say

5  anything about that plan -- you know, with regards to

6  the duplex -- in September, October 2022?  '23,

7  rather.

8    A.   Well, after we got up there, all of a sudden,

9  it was -- they were finding houses for us to go look

10  at.

11    Q.   Okay.

12    A.   And the issue of building on there was never

13  mentioned.

14    Q.   Eric said yesterday -- testified that you

15  made an announcement to the family that, you know,

16  that there's going to be -- you're going to join

17  house, right?  What do you recall about the -- the

18  lead-up to this looking at houses?

19    A.   Well, they were pushing us up there so quick,

20  and I thought, we've gotta do something, you know.

21  And so we -- I mentioned something about houses, and

22  the next thing I know that they're -- they've got a

23  realtor, and they've got us ready to go look at

24  houses.  But I was kind of shocked because the houses

25  that they were showing us were never anything that we

1  would ever buy.

2      Q.   Eventually, though, you see -- and there's

3  been testimony that you see this house on Golden

4  Court; do you remember that?

5      A.   Oh, yes.

6      Q.   What do you remember about that?

7      A.   Well, he was all excited and everything to go

8  and show us that house.  And of course, we had seen

9  all these others that, you know -- why are we looking

10 at these?  Is what we thought.  And then that house

11 was a very beautiful home.  It was in a very nice area

12 in town, not way out in the country in some road where

13 we would be, you know, stuck trying to get in there if

14 it was snowing.

15     And so we went in, and we looked at it.  It was

16 very pretty.  And it had a -- one -- the whole one

17 upper floor was like a regular home, but then it had a

18 basement down below that was already made into -- or

19 fixed up but not completed.  Started, but not

20 completed -- you could finish it up and make it into a

21 whole nother floor, just like the top floor.

22     Q.   Now, when you were looking at houses at that

23 time -- right?  You agree that Susan is your daughter,

24 right?

25     A.   Mhm.

25-80038-FPC   Doc 24-8   Filed 12/29/25   Entered 12/29/25 21:52:50   Pg 67 of 102

1      Q.   You agree Eric is your son-in-law?

2      A.   Mhm.

3      Q.   And at that time, had the Youngs made any

4    statements or representations about providing care to

5    you in the future, you and Ted?

6      A.   Oh, yes.

7      Q.   What did they say?

8      A.   Yeah.  Well, we needed to be there near them

9    so that they could care for us as we got older and

10   take us to the doctors and so on and so forth.

11     Q.   Did you trust -- at the time you're looking

12   at that Golden Court house, did you trust Eric Young?

13     A.   Oh, yes.

14     Q.   Did you trust Susan Young?

15     A.   Yes.

16     Q.   Did you believe that you could rely on the

17   things that they said?

18     A.   Absolutely.  Mhm.  I felt that they were

19   looking at -- trying to look out for our interests,

20   and we were trying to look out for theirs.  Kind of a

21   mutual thing.

22     Q.   So I want to talk about the discussions about

23   this Golden Court house.  So you've seen the house.

24     A.   Mhm.

25     Q.   Okay.  That night, what discussions did you

25-80038-FPC    Doc 24-8    Filed 12/29/25    Entered 12/29/25 21:52:50    Pg 68 of 102

1    have with the defendants about that house?

2         A.   Well, it wasn't very long after we had seen

3    the house that all of a sudden, we were being told

4    that, well, they wanted to -- they wanted to purchase

5    it, first of all.  And so that's what we decided to do

6    was to go ahead and put a bid, you know, and purchase

7    the house, offer -- make them an offer.

8         Q.   Now, let's talk about the specifics with

9    regards to what was said during that conversation.

10        A.   Mhm.

11        Q.   Okay.  What, if anything, did Eric say about

12   the down payment for that house?

13        A.   That we were -- he knew that we were going to

14   be making the down payment on the house.  And that --

15        Q.   And why is that?

16        A.   Because they didn't have any money.  They

17   didn't have any credit.

18        Q.   So did you offer to make that down payment?

19        A.   Oh, yes.  Mhm.

20        Q.   And -- and then what else was going to

21   happen, with regards to payments on the house?

22        A.   As soon as we got our house paid for -- I

23   mean, the house and the lot sold and everything, that

24   we would have --

25        Q.   When you say "the house," are you talking

25-80038-FPC    Doc 24-8    Filed 12/29/25    Entered 12/29/25 21:52:50    Pg 69 of 102

1   about the house in Baker City?

2       A.   The house in Baker City and the lot there in

3   Spokane.  We had no use for it after that -- that we

4   were going to take those funds, and we were going

5   to completely pay the house off.  And that way, they

6   would have no -- they would have to make no payments

7   to anybody.

8       Q.   And when you say "pay that house" -- "pay

9   that house off," you're talking about the Golden Court

10  house?

11      A.   The Golden Court house.  Mhm.

12      Q.   What, if anything, did Eric say to you about

13  the title of the Golden Court house during that

14  conversation?

15      A.   We were supposed to be on the title as

16  owners, and so would they be.

17      Q.   So he said both of you would be on the title?

18      A.   Well, the reason we said that was because we

19  knew that if -- if we were going to be living up there

20  and we passed away, that the house would just go to

21  them.  They wouldn't have to change anything.

22      Q.   Now, what about -- what about with regards to

23  the mortgage?  What, if anything, did you guys talk

24  about with regards to who was going to be on the

25  mortgage?

25-80038-FPC   Doc 24-8   Filed 12/29/25   Entered 12/29/25 21:52:50   Pg 70 of 102

1      A.   They were going to be on the mortgage, and we

2   were going to be on the mortgage.  And like I said,

3   when the -- our place was sold, then that would be it,

4   you know, no problem.

5      Q.   So did Eric say that you guys were going to

6   be on the mortgage?

7      A.   When we first started discussing it, yes.

8   Mhm.  We would be on it.

9      Q.   Oh, on October 11?

10     A.   Yeah.  Mhm.

11     Q.   Now, was -- was Eric going to make any

12  payments on this house?  During that conversation, was

13  there any discussion about Eric making payments on

14  that house, the Golden Court house?

15     A.   Yes.  He was going to make payments on the

16  house.

17     Q.   Is there a time where those payments were

18  going to stop?

19     A.   Oh, yes.

20     Q.   And when was that going to be?

21     A.   Just as soon as we had this place sold.

22     Q.   Okay.  Now, I just want to kind of recap.

23  You were going to put in the money.  You were going to

24  ultimately sell your other properties and put it all

25  into this house.

25-80038-FPC   Doc 24-8   Filed 12/29/25   Entered 12/29/25 21:52:50   Pg 71 of 102

1    A.   Right.

2    Q.   Did you want to be on the title of that

3  house?

4    A.   Absolutely.

5    Q.   Now, did Eric discuss anything about remodel

6  or work on that house?

7    A.   Yeah.  He was supposed to -- he was going to

8  be fixing the bottom floor up.  We were supposed to

9  have the top, and he was going to fix the bottom floor

10  up.  But until then, there was three bedrooms -- three

11  bedrooms on top.  So we were going to have the master,

12  and they were going to have the other two bedrooms.

13    Q.   Now, it seems like -- and you tell me -- but

14  it was kind of a joint effort?

15    A.   Yes.

16    Q.   Would you describe this, at this point, as a

17  joint effort?

18    A.   Absolutely.  Mhm.

19    Q.   And they were going to provide -- were they

20  going to provide some care for you guys as you guys

21  got older in that house?

22    A.   Yes.

23    Q.   At that point, did you trust what they said

24  to you?

25    A.   Yes.

25-80038-FPC    Doc 24-8    Filed 12/29/25    Entered 12/29/25 21:52:50    Pg 72 of 102

1    Q.   Based on those representations, during that

2  conversation -- Mr. Young, Susan -- did you agree to

3  provide a down payment for that house?

4    A.   Yes.

5    Q.   I want to talk to you about a gift letter,

6  okay?  Now, you've seen a document that says "gift

7  letter," right?  During this trial, you've seen it

8  many times?

9    A.   Yes.  Mhm.

10    Q.   What do you recall about the first time you

11  heard about a gift letter?

12    A.   I didn't know what it was for.  I never heard

13  of it before.

14    Q.   And what, if anything, did the defendants

15  tell you what this gift letter was?

16    A.   That because we had our money in Old West

17  Federal Credit Union and there were none down here,

18  that we could not transfer money from one state into

19  the other without having a gift letter.

20    Q.   Okay.  And so Mr. Young has testified about

21  you signing the gift letter, an actual document?

22    A.   Mhm.

23    Q.   What do you recall about providing your

24  signature to Mr. Young?

25    A.   I remember that there were -- there was one

25-80038-FPC    Doc 24-8    Filed 12/29/25    Entered 12/29/25 21:52:50    Pg 73 of 102

1  document that I signed. And the -- he had me sign a

2  blank piece of paper for that gift letter.

3      Q.  Okay. And where was -- where did that occur

4  at?

5      A.  That was at -- my signature actually came

6  when we were at the Postal Annex.

7      Q.  Well -- and we'll talk about the Postal

8  Annex. But I'm talking about -- was there an instance

9  where you provided your signature to Mr. Young in his

10  house?

11          THE WITNESS: Yes.

12          MS. YOUNG: Objection. Leading the witness,

13  Your Honor.

14          THE WITNESS: Yes, there was.

15          THE COURT: Overruled.

16      Q.  (BY MR. MENSIK) Okay. What do you remember

17  about that?

18      A.  He brought me the papers, and I signed my

19  name to the paper.

20      Q.  Well, when you say "the paper," what does

21  that mean?

22      A.  Blank -- it was a blank piece of paper.

23      Q.  Was there anything on that piece of paper at

24  all?

25      A.  No.

1  Q. So it was just a pen and a piece of paper?

2  A. Right.  He said he would take care of the

3 rest of it.

4  Q. And so with that, he takes that blank piece

5 of paper, and then what?  Do you know?

6  A. I didn't know what else he did with it, no.

7  Q. Before -- so between October 11th, right?

8  A. Mhm.

9  Q. Golden Court -- talking about the Golden

10 Court house -- and this October 16th where the money

11 is now transferred out of your account occurred, did

12 you ever tell Eric and Susan that you were giving them

13 a gift of $180,000?

14  A. Never.

15  Q. Did you ever tell them that you were giving

16 them a gift of $242,000?

17  A. Never.

18  Q. Did you ever tell them that you were giving

19 them a gift of $362,000?

20  A. Absolutely not.

21  Q. I want to talk about this conversation with

22 the bank on the 12th.

23  A. Mhm.

24  Q. Now, there's been some testimony -- and

25 without going -- just kind of getting to the thrust of

 1   it.  On October 12th, right?  It's this first series

 2   of calls with Old West Federal Credit Union.

 3       A.   Mhm.

 4       Q.   What do you remember about that first call?

 5       A.   I was connected to them.

 6       Q.   When you say "them," who's that?

 7       A.   With Old West and to Eric.  They were already

 8   on the line.  They called me and connected me

 9   together.

10       Q.   Okay.  So Eric was already on the line?

11       A.   Mhm.

12       Q.   Okay.  And then what do you remember about

13   that call?

14       Well, let me ask you this.  Did --

15       A.   Go ahead.

16       Q.   Did Old West Federal Credit Union agree to

17   transfer money during that call?

18       A.   No.  They wouldn't transfer the money.

19       Q.   And what did they say the reason was for not

20   transferring the money?

21       A.   Because we had -- I had been -- it was a

22   large sum of money, and I had to be in the office to

23   do that, so they wouldn't transfer the money.

24       Q.   And -- and going back to this transfer of

25   this money, how much money are we talking about?

25-80038-FPC   Doc 24-8   Filed 12/29/25   Entered 12/29/25 21:52:50   Pg 76 of 102

```
1        A.   300 and something thousand dollars.  Close to
2    400 -- the total.
3        Q.   Well, ultimately --
4        A.   Would have been -- the actual amount we
5    wanted transferred was for the down payment on the
6    house.
7        Q.   So on the 12th, what was your understanding
8    about the down payment on the house?
9        A.   $180,000.
10       Q.   So that first call, were you wanting to
11   transfer 180?
12       A.   Yes.
13       Q.   Now, setting everything else aside -- because
14   we know ultimately, the money gets transferred from
15   your Old West account into Eric's account.  But on the
16   12th, what was your intention for that transfer of
17   $180,000?
18       A.   It was to be for the down payment on the
19   house that we were purchasing.
20       Q.   But with regards to having it wired out of
21   Old West --
22       A.   Oh, it was to go to -- it was going to go
23   into my account.
24       Q.   Well, which account?
25       A.   At Chase Bank.
```

         1      Q.   And why is that?

         2      A.   Because there are no Old West Credit Unions

         3   here, so I would have to put it into our account here

         4   so I would be able to get into my own account and have

         5   money.

         6      Q.   So you wanted the money transferred from your

         7   account in Old West Federal Credit Union into your

         8   Chase account?

         9      A.   Correct.

        10      Q.   So on the 12th, the bank does not allow this

        11   to go forward?

        12      A.   Right.

        13      Q.   Now on the 13th, we've heard that there's

        14   another series of calls?

        15      A.   Mhm.

        16      Q.   And Mr. Young testified that he made a series

        17   of calls to other branches down in Oregon.  What do

        18   you remember about that?

        19      A.   He actually went kind of hunting to try to

        20   find another Old West bank that would allow him to do

        21   that, to transfer those funds.

        22      Q.   Now, was -- did Eric tell you anything -- or

        23   what, if anything, did he say about the timing or the

        24   speed of these transfers?

        25      A.   Well, we had to get it done right away.  We

25-80038-FPC    Doc 24-8    Filed 12/29/25    Entered 12/29/25 21:52:50    Pg 78 of 102

1  didn't want to lose the house, you know.

2       Q.  Well, when he tells you, get it done right

3  away, did he give you a reason for that?

4       A.  A reason for getting it done right away?

5       Q.  Yeah, if you recall.

6       A.  I don't really recall exactly why we had to

7  get it done right away.  All I know is that we had to

8  get the money down for the down payment because we

9  didn't want to lose the house.

10      Q.  And is that understanding about losing the

11  house -- is that based on something Eric told you?

12      A.  Yes.

13      Q.  Were you talking to the real estate agent at

14  that time?

15      A.  No.

16      Q.  Were you talking to Guaranteed Rate mortgage

17  at that time?

18      A.  No.

19      Q.  When -- when Eric says this about the timing

20  and needing to get the money, did you trust what he

21  said?

22      A.  Yes.

23      Q.  Let's talk about conversations on October

24  13th with the bank.  What do you remember about that

25  conversation?

25-80038-FPC   Doc 24-8   Filed 12/29/25   Entered 12/29/25 21:52:50   Pg 79 of 102

1          A.   When we first were talking to them --

2          Q.   Well, which branch were you talking to?

3          A.   I was talking to the branch in -- where we

4     lived in Baker.  And then there was another call that

5     was made to the branch that he had found.  That was in

6     -- what's the name of that town?

7          Q.   La Grande?

8          A.   La Grande, yes.

9          Q.   What do you remember about that call with

10    that branch in La Grande?

11         A.   They were willing to do that.  They were

12    willing to give the money.

13         Q.   Now, when you joined that call, was Eric part

14    of that call?

15         A.   Yes.

16         Q.   Okay.  And then ultimately -- right?  You

17    know, Old West gets your Chase -- well, how does --

18    what do you recall about Old West and your Chase bank

19    account numbers on that call with Old West Federal

20    Credit Union?

21         A.   Old West and the Chase.

22         Q.   Well, the Chase -- so your Chase account

23    numbers.

24         A.   Okay.  I had to give that the numbers, the

25    actual numbers to our Chase account to Eric.

25-80038-FPC   Doc 24-8   Filed 12/29/25   Entered 12/29/25 21:52:50   Pg 80 of 102

1    Q.  So you provided them to Eric?

2    A.  Mhm.

3    Q.  And then why did you provide them to Eric?

4    A.  Because he was going to take care of that --

5 taking care of putting that into -- finishing up

6 whatever we needed to have done with it.

7    Q.  Okay.  And then when you gave him those

8 numbers, did you trust that Eric was going to go ahead

9 and give those numbers to the bank?

10    A.  Yes.  I had no idea that he would not fall

11 through -- I mean, follow through with that.

12    Q.  So I want to ask you -- because we've heard

13 testimony yesterday, and kind of just -- kind of

14 cutting to the chase.

15    A.  Mhm.

16    Q.  There's an initial talk about a wire of

17 $180,000 for a down payment.  And then all of a

18 sudden, that 180 jumps up to this $242,00 number.  Why

19 is that?

20    A.  The 180 and then the 200?

21    Q.  Well, so we've got -- initially, you're

22 talking about a -- providing a down payment of

23 $180,000, a wire.

24    A.  Mhm.

25    Q.  And then on the 13th, you're now asking Old

25-80038-FPC   Doc 24-8   Filed 12/29/25   Entered 12/29/25 21:52:50   Pg 81 of 102

1  West, based on -- we've got two transfers now.  We've
2  got 242 and then 119.
3      A.   Mhm.
4      Q.   Why do we have a transfer now of 242 and 119?
5      A.   Because they were supposed to put that other
6  money that was in the account -- because it was
7  closing that out -- into my Chase Bank account.
8  That's why I gave him those numbers, so he could take
9  care of all that.
10     Q.   Well, what was going to happen with your Old
11 West?
12     A.   I was going to close it out.
13     Q.   Why were you going to close it out?
14     A.   Because I was a little angry that we had them
15 all this time, and then they couldn't do this.  And
16 then yet he was saying that this other bank could, so
17 I thought, well, why don't -- why didn't they do it?
18 You know, so -- and besides that, if we were going to
19 be coming up here, we wouldn't need them, anyway.
20     Q.   I'm going to take you to Exhibit 18.  Now,
21 Exhibit 18 is a wire -- or it's a series of emails; do
22 you see that?
23     A.   Yes.
24     Q.   And I want to draw your attention to the
25 bottom email from Dawn Bruce, dated October 13th,

25-80038-FPC   Doc 24-8   Filed 12/29/25   Entered 12/29/25 21:52:50   Pg 82 of 102

1  2023; do you see that?

2      A.   Yes.

3      Q.   Who is Dawn Bruce?

4      A.   Dawn Bruce was the person that was from Old

5  West bank.

6      Q.   And it says -- the address there of this

7  email -- it says "to," and it says

8  "ljc4444@yahoo.com."  Do you see that?

9      A.   Yes.

10     Q.   And that's your email address?

11     A.   Yes, it was.  Mhm.

12     Q.   How often do you check your emails?

13     A.   Not very often.

14     Q.   On the 13th of October, did you see this

15  email?

16     A.   No.

17     Q.   And above that, there's another email.  And

18  we've got other exhibits in the record, but I'll

19  represent that was sent on October 15th.  And it says,

20  "Hello, Linda."  Do you see that?

21     A.   Yes.

22     Q.   Do you remember seeing that email on the

23  15th?

24     A.   Nope.

25     Q.   Go to Exhibit 26.  Now, Exhibit 26 is an

```
 1   email that's already been admitted and put in the
 2   record.  It's an email from -- it says Linda Cole to
 3   eyoung@syanda.com dated Saturday, October 14th, 2023
 4   at 10:09 a.m.; do you see that?
 5        A.  Yes, I do.
 6        Q.  Did you send this email?
 7        A.  No, I did not.
 8        Q.  Did you ask Eric to get into your account and
 9   send this email?
10        A.  No, I did not.
11        Q.  Did you sit there and watch Eric get in your
12   email with your permission and send this email?
13        A.  No.  Never.
14        Q.  It was your testimony earlier -- well, we'll
15   get to that.  We'll get to that.
16        Let's go to Exhibit 28.  Are you there?
17        A.  Yes.
18        Q.  Now, you've seen this during the course of
19   this trial, Exhibit 28, page 1.  This is an Old West
20   Federal Credit Union outgoing domestic wire form; do
21   you see that?
22        A.  Yes.
23        Q.  Now turn the page -- to page 3.
24        A.  Yes.
25        Q.  Did you sign this page?
```

25-80038-FPC    Doc 24-8    Filed 12/29/25    Entered 12/29/25 21:52:50    Pg 84 of 102

```
 1      A.   Yes.

 2      Q.   Okay.  And did you sign this in front of a

 3   notary?

 4      A.   Yes, I did.

 5      Q.   Go back to page 1.  Did you sign this page?

 6      A.   No, I did not.

 7      Q.   Go to Exhibit 29.

 8      A.   Oh, 29.  Okay.

 9      Q.   This is an Old West Federal Credit Union

10   outgoing domestic wire form dated October 16th.  Now,

11   that's page 1.  Page 3.  Do you see that?  Go to page

12   3.

13      A.   Page 3.  Yes.

14      Q.   Did you sign this document?

15      A.   Yes.

16      Q.   Go to page 1.  Did you sign that document?

17      A.   No, I did not.

18      Q.   With regards to page 3, when you signed that

19   document, did you know where Eric got that document

20   from?

21      A.   No.

22      Q.   What did Eric tell you about -- did Eric tell

23   you anything about signing this document?  The day you

24   signed it, what did you understand you were doing?

25      A.   That it was to get the -- everything taken
```

25-80038-FPC    Doc 24-8    Filed 12/29/25    Entered 12/29/25 21:52:50    Pg 85 of 102

1  care of in the bank -- the, you know, wire, this --

2  everything had to be taken care of.

3      Q.   On that day -- so this date is signed October

4  14th, 2023.  Do you have a recollection of Eric Young

5  telling you that Old West made a mistake on one of the

6  wire forms and that the 119 was accidentally going

7  into his bank account?

8      A.   Yes.  I remember them telling us they made a

9  mistake.  I was like, oh.

10      Q.   Well, when do you remember them telling you

11  that they made a mistake?

12      A.   It was just right after this had happened,

13  and they told me -- they said -- it was, like, the

14  next day or whatever.  And they said, oh, Mom, the --

15  the credit union -- they made a mistake.  And I said,

16  well, what?  And they said, they put all of your funds

17  into Eric's account.  I said, well, fine.  I said,

18  tell them to put it in the correct one.

19      Q.   Did they tell you that after the money had

20  been wired or before?

21      A.   After.

22      Q.   Do you remember seeing testimony from --

23  well, let's go -- let's go to this.  You just talked

24  about a conversation in which the Youngs tell you that

25  the money had been accidentally placed into their

25-80038-FPC    Doc 24-8    Filed 12/29/25    Entered 12/29/25 21:52:50    Pg 86 of 102

1    account.  Who told you that?

2        A.  Well, actually, I think I first heard it from

3    Susan.

4        Q.  Okay.  And when you first heard that from

5    Susan, what actions, if any, did you take?

6        A.  I told them.  I said -- I said, well, they

7    need to put it back into the right -- into the right

8    account.  And I knew -- I just knew at that time that

9    we had been taken right then and there.

10        Q.  Were you finding it hard to understand how

11    your -- all this money had gone into their account?

12        A.  Oh, yes.  They don't -- I didn't -- banks

13    don't -- that's a lot of money.  They don't make

14    mistakes like that.

15        Q.  So we heard this conversation that was

16    recorded -- or parts of it on October 20th, 2023.

17        A.  Mhm.

18        Q.  And you made that recording, correct?

19        A.  Yes.

20        Q.  Why did you make that recording?

21        A.  Because at that point, I realized anything

22    that they said, we could not trust, and I really

23    needed to get it down so that we had something that

24    could back us up in what we made a statement about.

25        Q.  And what were you trying to get down?

25-80038-FPC    Doc 24-8    Filed 12/29/25    Entered 12/29/25 21:52:50    Pg 87 of 102

1      A.   I was trying to get down what they had done

2   to us.

3      Q.   And then you asked questions in that

4   recording about the Old West funds and where they

5   went; do you remember that?

6      A.   Yes.  Mhm.

7      Q.   Why were you doing that?

8      A.   I wanted to have -- I wanted to find out why

9   they did do that.  I wanted to know what happened,

10  what really happened.

11     Q.   Okay.  Now on October 20th, when you made

12  that recording, did -- based on your understandings of

13  conversations, did Ted know what was going on?

14     A.   He -- he knew what had happened to us at that

15  point, yes.  Mhm.

16     Q.   Okay.  Now, who is Rebecca Flaherty?

17     A.   That was the realtor that was supposed to be

18  handling the transactions.

19     Q.   Did you call her?

20     A.   Yes.

21     Q.   What was the purpose of calling her?

22     A.   I wanted to know what was going on and why --

23  why -- why we were not on the title to that, what was

24  going on.  And she told me that she was dealing only

25  directly with him, that he was the one that was

25-80038-FPC   Doc 24-8   Filed 12/29/25   Entered 12/29/25 21:52:50   Pg 88 of 102

1  purchasing the house.

2      Q.  That's "him" being Eric?

3      A.  That being Susan and Eric.  Or Eric,

4  actually.  Her name wasn't even on it.

5      Q.  After that conversation on the 20th of

6  October, what, if anything, did you do immediately

7  after?

8      A.  Immediately after that, I disappeared from

9  the house.  Nobody knew, not even my husband, where I

10 went -- got to the car, and I drove down to the bank.

11     Q.  Which bank?

12     A.  To my Chase Bank.

13     Q.  Why did you go to your Chase Bank?

14     A.  Because that's where I had my funds, and I

15 took the funds that were in there out, and I put them

16 in -- I opened up a whole new account, and I took all

17 of the information, and I sent it by -- I went to the

18 Postal Annex, and I sent it to Joell.

19     Q.  And that's Joell Severns?

20     A.  Severns.  Mhm.

21     Q.  Did you speak with Joell Severns that day, as

22 well?

23     A.  Yes.  And I told her -- I told her what had

24 just happened.  And I said, I'm sending you an

25 envelope.  I said, just please hold onto it for me

25-80038-FPC   Doc 24-8   Filed 12/29/25   Entered 12/29/25 21:52:50   Pg 89 of 102

1  until I get -- she said, "I will, Mom."

2      Q.  Did you and Joell talk about anything -- did

3  you and Joell talk about kind of the events leading up

4  to the -- how you got to where you were at?

5      A.  Oh, yes.

6      Q.  Did you talk to Joell about this gift letter?

7      A.  Yes.

8      Q.  What do you -- what do you remember talking

9  about this gift letter?

10     A.  She was asking me, what do you mean, a gift

11 letter?  And I said, well, I didn't know very much

12 about it all -- that we had to have a gift letter to

13 be able to have these transferred from the Old West,

14 from -- I was told that we had to have a gift letter

15 to transfer the funds from there across the state line

16 into Oregon -- I mean, from Oregon into Washington.

17     Q.  And what, if anything, did she say to you

18 about that?

19     A.  She said, what?  She said, what?  She had

20 never heard of that before.

21     Q.  Okay.  During that conversation with Joell,

22 were you crying?

23     A.  Oh, very, very -- yeah.

24     Q.  And why were you crying?

25     A.  I was completely devastated because I had

25-80038-FPC   Doc 24-8   Filed 12/29/25   Entered 12/29/25 21:52:50   Pg 90 of 102

1  trusted them after so many times of other things

2  happening that we had to walk away from them, and this

3  time -- we thought that this time, they finally had

4  grown up, and we could trust them, and we could become

5  a family.  But that turned out to be wrong, so wrong,

6  because not only did they not want to be a family,

7  they wanted to take every single thing away from us,

8  including every penny we had.

9       Q.  On October 21st, the day after you make that

10  recording, you leave the defendant's house, right?

11       A.  Yes.

12       Q.  Now, on that day -- we've heard portions of

13  it.  But you were recorded.  You and Ted were

14  recorded.

15       A.  Mhm.

16       Q.  So you've seen that now?

17       A.  Yeah.

18       Q.  What do you recall about the circumstances

19  surrounding that recording?  That conversation that

20  occurred that was recorded?

21       A.  Remind me which day we're talking about here.

22       Q.  So this is October 21st, the day you're

23  leaving.

24       A.  Mhm.

25       Q.  What do you remember about that final

25-80038-FPC    Doc 24-8    Filed 12/29/25    Entered 12/29/25 21:52:50    Pg 91 of 102

1    conversation before you leave?

2        A.   Well, we told them that we were going to be

3    leaving and that we wanted to have that money back.

4    And we were told that we were not going to get the

5    money back.  They were going to be going ahead and

6    buying that house.  And --

7        Q.   Let me ask you this.  After you left on the

8    21st, where did you and Ted go?

9        A.   On the 21st?

10       Q.   On the 21st, when you left the defendant's

11   house, where did you go?

12       A.   I believe we went -- I believe at that time,

13   we went back home.  There was two different times in

14   there.  What we did -- we went -- at one point, we had

15   to go back home.  We went and got an attorney, had

16   everything -- tried to be straightened out, sent them

17   a letter, and then we had to go back and get our

18   things.  And I'm not sure -- there's so much that

19   happened at that time.  I'm not sure if we went back

20   to the house the next day to ask for our -- our other

21   things that were in the house.

22       Q.   That night after you left, do you remember

23   where you -- on the 21st, that night when you left,

24   where did -- do you remember where you and Ted slept?

25       A.   Oh, yes.  That night, yes.  When we left that

25-80038-FPC    Doc 24-8    Filed 12/29/25    Entered 12/29/25 21:52:50    Pg 92 of 102

1  house that day -- I'm sorry.  Yes, we went over, and
2  we stayed in our -- our car.  We had our travel
3  trailer over with us, and we slept behind the travel
4  trailer in our vehicle.
5      Q.  I want to go to Exhibit 31.  And I'll try to
6  be as brief as I can.  And this is an October 26th,
7  2023 text message.  And it says -- do you see that?
8  It says "Susanann" at the top.
9      A.  Yes.
10     Q.  Go to the third page, down at the bottom.  It
11  says, we all -- "We want all of the money that you
12  transferred from our bank account to yours."  Do you
13  see that?
14     A.  Yes.
15     Q.  Why are you asking for that money on that
16  date?
17     A.  That was the 23rd.  Okay.
18     Q.  It was the 26th.
19     A.  26th.  I'm sorry.  We wanted that money
20  because it did not belong to them.  They had no right
21  to it, and we wanted everything that we -- all the
22  money to be returned to us, and we wanted the things
23  that we had that belonged to us, also, that we could
24  take.  There were things in the house that -- that she
25  had of mine that I didn't have.

25-80038-FPC   Doc 24-8   Filed 12/29/25   Entered 12/29/25 21:52:50   Pg 93 of 102

```
 1        Q.   Now, go to Exhibit 32.

 2        A.   Exhibit --

 3        Q.   Exhibit 32.

 4        A.   Mhm.

 5        Q.   This is a text message dated Monday, October

 6   30th, 2023.  And it says, "Good afternoon.  Dad and I

 7   just wanted to make sure you know that we have changed

 8   our minds about buying the house."  Do you see that?

 9        A.   Yes.

10        Q.   And then on pages 2 and 3, you ask for

11   repayment of the money that was transferred out of

12   your bank account; do you see that?

13        A.   Yes.

14        Q.   And just to hurry this along, is this another

15   request to have that money returned?

16        A.   Yes.

17        Q.   Go to Exhibit 6.

18        A.   Exhibit 6.  I have it.

19        Q.   Now, I'll go to the back page, and I'll just

20   tell you, on page 2, there's -- Floyd C. Vaughan is

21   the guy who signs this letter.

22        A.   Yes.

23        Q.   Who's Floyd C. Vaughan?

24        A.   He's our lawyer.

25        Q.   And he's your lawyer in --
```

25-80038-FPC   Doc 24-8   Filed 12/29/25   Entered 12/29/25 21:52:50   Pg 94 of 102

```
 1      A.   Baker City.

 2      Q.   And he wrote this letter?

 3      A.   Yes, he did.

 4      Q.   And that's dated the 30th of October, 2023?

 5      A.   Yes.

 6      Q.   Go to Exhibit 8.  Are you there?

 7      A.   Yeah.

 8      Q.   Who is Michael Merritt?

 9      A.   That was the attorney that we first engaged

10   to start all this.

11      Q.   And "start all this" -- start the lawsuit?

12      A.   The lawsuit, yes.

13      Q.   In that letter -- he wrote this letter?

14      A.   Yes, he did.

15      Q.   Dated November 3rd, 2023?

16      A.   Yes.

17      Q.   Now, then, after this, you and Ted filed a

18   lawsuit against the defendants, correct?

19      A.   Yes.

20      Q.   I want to take you -- I want to take you to

21   Exhibit 11.

22      A.   Mhm.

23      Q.   And I want you to go to page 6 of Exhibit 11.

24      A.   Yes.

25      Q.   Now, with regards to Exhibit 11, what is this
```

25-80038-FPC    Doc 24-8    Filed 12/29/25    Entered 12/29/25 21:52:50    Pg 95 of 102

1  document?

2       A.  It's -- it's a message that was on my phone.

3       Q.  Okay.  Now, were the messages on a -- on a

4  Signal app?

5       A.  Yes.

6       Q.  Who downloaded the Signal app on your phone?

7       A.  The Youngs.

8       Q.  And what do you recall about receiving these

9  messages?

10      A.  Well, some of the messages stayed, but these

11 particular ones that he had sent to us -- they

12 disappeared.  I was reading the one.  And when I saw

13 it, I opened it up, and I read it.  And before I even

14 finished the last line, it went away.  So I

15 immediately just snapped on the phone when the second

16 one came up because I figured it's going to disappear,

17 and I'm not even going to be able to read it.

18      Q.  Have you ever received a disappearing message

19 before in your life?

20      A.  Never.

21      Q.  I want to go to the first page of this

22 message.  It says it's from Eric Young; do you see

23 that?

24      A.  Are you talking about the same page I'm on?

25      Q.  Oh, no.  Page 1.  Go all the way to the front

25-80038-FPC   Doc 24-8   Filed 12/29/25   Entered 12/29/25 21:52:50   Pg 96 of 102

1    of that exhibit.

2        A.   Oh, the front.

3        Q.   You see it says "Eric Young"?

4        A.   Yes.  Uh-huh.

5        Q.   And you understood at the time that this was

6    coming from Eric Young?

7        A.   Yes.

8        Q.   And he says, "Also want to let you know we

9    have an attorney now, and the court result is not

10   going to go well for you, Mom, if you persist in this

11   effort."

12       A.   Yes.

13       Q.   And then he says -- on pages 3 and 4, he

14   says, "Not to mention that taking brothers to secular

15   court is completely against the guidance of Jehovah's

16   organization.  That will also not go well for you."

17       When you received this message, what did you

18   think?

19       A.   I thought it was a threat.

20       Q.   How did it make you feel, receiving this

21   message?

22       A.   I was very, very angry because he was stating

23   things here that were absolutely not true.

24       Q.   Okay.

25       A.   And I felt that we were being threatened.

25-80038-FPC   Doc 24-8   Filed 12/29/25   Entered 12/29/25 21:52:50   Pg 97 of 102

1     Q.   How has this -- you contend that the Youngs

2   converted $362,000, that they committed fraud.   Those

3   are your contentions -- this is for the Court to make

4   this decision?

5     A.   Absolutely.

6     Q.   How has what you contend is the loss of those

7   funds impacted you and Ted?

8     A.   It's totally devastated our lives.

9     Q.   And I want you to explain.

10     A.   And our relationship with them is no longer.

11   Just none.   So we've lost a daughter, son-in-law, and

12   a grandson.

13     Q.   Now, that money that was taken at that time,

14   that 362 -- did that constitute -- well, how much of

15   your savings, your and Ted's savings, did that

16   constitute?

17     A.   That was it.   That was all of it.

18   Everything.   That came from his mother that she had

19   given to him when she -- when she had set up to give

20   to him.   Well, she set up more than that to give to

21   him when she was -- passed away.

22     Q.   Did you have any other money in the Chase

23   account at that time?

24     A.   A little, but not nothing like that, no.

25     Q.   I want to show you -- I'm going to read you

25-80038-FPC   Doc 24-8   Filed 12/29/25   Entered 12/29/25 21:52:50   Pg 98 of 102

1  something.  These are your responses to -- your and

2  Ted's responses to Defendant's first requests for

3  admission.

4       And I'm going to read Admission No. 47 to you.

5  I'm going to read the question.  I'm going to read

6  this statement.

7       Request for Admission No. 47.  "Admit that you

8  became frustrated with OWFCU preventing access to your

9  funds and decided to liquidate your accounts, changing

10 the amount of your original wire request and the

11 amount of the gift letter from $180,000 to

12 $242,314.62."

13      Response:  "Plaintiffs object to this request as

14 impermissibly compound.  The request can only request

15 admission of one fact per request.  This request is

16 irrelevant, vague, and ambiguous.  Without waiving

17 said objection, Plaintiffs admit that Plaintiffs

18 became frustrated with OWFCU and intended to transfer

19 the $242,314.62 balance out of their OWFCU account to

20 their Chase Bank account so Defendants would have

21 access to those funds in Spokane, Washington."

22      Did you intend for the defendants to have access

23 to those funds?  So let me read this sentence.  It

24 says, "And intended to transfer the $242,314.62

25 balance out of their OWFCU account to their Chase Bank

1 account so defendants would have access to those funds

2 in Spokane."

3     Did you -- yeah, go ahead.

4     A.   It was the money that was -- we wanted

5 transferred was to go into our Chase account so that

6 Ted and I would be able to get into the account and

7 have -- be able to access our money.

8     Q.   Did you -- did you request -- did you want

9 the defendants to have access to those funds?

10    A.   No.

11         MS. YOUNG:  Objection, Your Honor.  Leading

12 the witness.

13         THE WITNESS:  Absolutely not.

14         THE COURT:  That's not a leading question, so

15 overruled.

16         MS. YOUNG:  Okay.

17         MR. MENSIK:  Okay.  Now, I'm going to read

18 you another request for admission.  Request for

19 Admission No. 25.  It says, "Admit you told OWFCU that

20 you wanted to empty and close your accounts."  And

21 then it says, bracket, "emails."

22         Response:  "Plaintiffs admit that they wanted

23 to transfer their money from the OWFCU account into

24 their Chase Bank account so that they would have

25 access to the funds while in Spokane, Washington."

```
 1          Is that accurate?
 2      A.   It's true.
 3      Q.   So that prior request for admission response
 4  where it has "Defendants" instead of "Plaintiffs" --
 5  was that a mistake?
 6      A.   Yes.
 7          MS. YOUNG:  Objection, Your Honor.  That RFA
 8  and RFP have already been entered into the record, and
 9  they've had sufficient time to make any edits.  I
10  think that's backing into a sham affidavit to fit
11  their story.  And Plaintiff's counsel is attempting to
12  get her to change her story to fit that narrative.
13  Those RFAs and RFPs were not objected to.  They stand.
14          MR. MENSIK:  Your Honor.
15          THE COURT:  Mr. Mensik.
16          MR. MENSIK:  Your Honor, they're not part of
17  the record in this trial.  They submitted some kind of
18  a breakdown yesterday of this in their motion, Your
19  Honor.  And I'm just cleaning up something they point
20  out.  They point out a typo transposing "Defendants"
21  and "Plaintiffs" when just above that, the right thing
22  is said, that the money was transferred from their
23  account into their Chase account for their access of
24  it, not Defendants.  And I'm cleaning that up, Your
25  Honor.
```

25-80038-FPC    Doc 24-8    Filed 12/29/25    Entered 12/29/25 21:52:50    Pg 101 of 102

```
 1              THE COURT:  I'm going to allow it.  It'll go
 2    to the weight.
 3              MS. YOUNG:  Okay.
 4              THE COURT:  And it's not part of the record,
 5    just so you know.  It's not part of the trial
 6    record --
 7              MS. YOUNG:  Okay.
 8              THE COURT:  -- at this time.
 9              MR. MENSIK:  Your Honor, I have no further
10    questions for the witness at this time.
11              THE COURT:  Okay.  Let's take our break.
12    Let's come back at 10:15.  I'm going to finish my
13    notes, so feel free to go ahead and head out to break.
14              (Recess taken.)
15              THE COURT:  Mr. and Ms. Young, who's going to
16    start with cross-examination?
17              MS. YOUNG:  I will.
18              THE COURT:  Okay.
19               C R O S S - E X A M I N A T I O N
20    BY MS. YOUNG:
21        Q.  Ms. Cole, did you receive a summons for a
22    deposition to be taken of you in this case?
23        A.  Yes.
24        Q.  And did you attend that deposition with your
25    counsel, Mr. Mensik?
```

25-80038-FPC    Doc 24-8    Filed 12/29/25    Entered 12/29/25 21:52:50    Pg 102 of 102