# Exhibit K

1   come on up.

2            MR. YOUNG:  Around here?

3            THE COURT:  Yes.

4            MR. YOUNG:  Okay.  Do I stand first or --

5            THE COURT:  You can sit.  That's fine.

6            I'll swear you in.  Do you affirm and attest

7   that the testimony you're about to give is the truth?

8            MR. YOUNG:  I do.

9            THE COURT:  Thank you.  Counsel, go ahead.

10           MR. MENSIK:  Yes, Your Honor.

11              D I R E C T   E X A M I N A T I O N

12  BY MR. MENSIK:

13       Q.  Mr. Young, can you state -- please state your

14  full name and spell your -- state and spell your full

15  name for the record.

16       A.  Eric Ross Young, E-R-I-C R-O-S-S Y-O-U-N-G.

17       Q.  And what is your address?

18       A.  12402 North Division, #167, Spokane,

19  Washington 99218.

20       Q.  Okay.  You don't live at Wandermere Mall, do

21  you?

22       A.  No.  That's my mailing address.

23       Q.  What's your real address?

24       A.  That's the mailing address I feel comfortable

25  revealing in court.  We have concerns about safety

25-80038-FPC   Doc 24-11   Filed 12/29/25   Entered 12/29/25 21:52:50   Pg 2 of 40

1    with parties to this case and other nonparties.

2        Q.   So you're not going to give your address?

3        A.   Not the physical address, unless I'm being

4    forced, but we have that mailing address.  It's on our

5    filings, as well.

6        Q.   You live at 24 East Sapphire Lane, right?

7        A.   Okay.  If you say so.

8            THE COURT:  Mr. Young, you need to answer the

9    question.

10       Q.   (BY MR. MENSIK)  You live at 24 East Sapphire

11   Lane, Spokane, Washington, correct?

12       A.   That is a physical address, yes.

13       Q.   And that is where you live?

14       A.   Okay.

15           THE COURT:  Mr. Young, answer the question.

16           THE WITNESS:  Okay.  Yes, that's where we

17   live.

18       Q.   (BY MR. MENSIK)  You've been living there

19   since August, right?

20       A.   No.  October, I think.

21       Q.   A couple of months?  So let me ask you this.

22   You ever been a party to a lawsuit before?

23       A.   Nope.

24       Q.   Never have?

25       A.   No.

1          MR. MENSIK:  Your Honor, may I approach?

2          THE COURT:  Mhm.

3          MR. MENSIK:  Your Honor, would you like a

4  copy of this?

5          THE COURT:  Please.

6      Q.  (BY MR. MENSIK)  Mr. Young.

7      A.  Hmm.

8      Q.  Does this refresh your recollection that Bank

9  of America sued you in Montgomery County, Texas?

10     A.  I think you have the wrong bank, according to

11  this document.

12     Q.  I'm sorry.  American Express, rather.

13  American Express National Bank?

14     A.  Okay.

15     Q.  Okay.  Does this refresh your recollection

16  that American Express sued you in 2019?

17     A.  Yeah.  It was a -- what do you call it?  A --

18  not a non -- it wasn't a party where I had to be there

19  is what I mean.  So I was not present to any of this,

20  which is why it wasn't in my memory.

21     Q.  So when it has your name in the caption

22  there, that doesn't -- are you saying you're not a

23  party to this?

24     A.  I said I didn't go to anything related to

25  this.  It was all handled on the back end.  I didn't

25-80038-FPC   Doc 24-11   Filed 12/29/25   Entered 12/29/25 21:52:50   Pg 4 of 40

1  address this in court or anything like that.  It
2  wasn't even to my mind, you know, a lawsuit, per se.
3      Q.  You were sued --
4      A.  So I stand corrected.  I stand corrected that
5  there was this.
6      Q.  Okay.  There's just this one.
7      A.  Yeah.
8      Q.  Okay.  And you were sued for $11,787.71?
9      A.  It's possible.  I don't know what that number
10  was on here.  I can look again.  That's what it says.
11     Q.  All right.  So you got a -- there was a
12  judgment in that case, wasn't there?
13     A.  I believe so, yeah.
14     Q.  Yeah.  And in fact, you paid that judgment?
15     A.  True.  Yeah.
16     Q.  And you paid it out of proceeds of the sale
17  of your house?
18     A.  That is true.
19     Q.  In Texas?
20     A.  Yes.
21     Q.  And the sale of the house was sometime around
22  October, November 2022?
23     A.  Roughly.  I think so.
24     Q.  All right.  Just wanted to clear up that
25  issue with that lawsuit.  Any other lawsuits?

Linda and Ted Cole v. Eric and Susan Young
Trial – Volume I of II

```
1        A.   Not to my knowledge.

2             MR. MENSIK:  All right.  Your Honor, may I

3   approach?

4             THE COURT:  Yes.

5        Q.   (BY MR. MENSIK)  Okay.  Mr. Young, does this

6   refresh your recollection that Bank of America sued

7   you again in Montgomery County, Texas, this time in

8   2020?

9        A.   I was not aware of this one, no.

10       Q.   Okay.  And is that because you were evading

11  service?

12       A.   Of course not.

13       Q.   Okay.

14       A.   Lived in the same place for 16 years, since

15  you asked.

16       Q.   Okay.  Do you remember seeing a Plaintiff's

17  Motion for Substitute Service in that same case where

18  they said they just couldn't find you, couldn't get in

19  the gate?

20       A.   That's possible.  It's a gated -- it was a

21  gated community, golf course community in Texas, north

22  of town -- north of Houston.

23       Q.   This lawsuit -- do you remember how much you

24  were sued for on this one?

25       A.   Yeah.  As I said, I'm not familiar with this
```

1   at all.

2       Q.  Okay.  $27,172.42 --

3       A.  There you go.

4       Q.  -- do you see that?

5       A.  I do.

6       Q.  So just between these two lawsuits, we're at

7   $40,000.  So the 2019, 2020 -- do you agree with that?

8       A.  Approximately.

9       Q.  Any other lawsuits?

10      A.  Not to my knowledge.

11      Q.  You can't remember?

12      A.  Not to my knowledge.

13      Q.  2022 -- do you remember what the total tax

14  liens on your house were?

15      A.  $40,000, I think.

16      Q.  Okay.  And that was for unpaid taxes for

17  2016; remember that?

18      A.  Oh, we had a tax accountant and attorney out

19  of Florida --

20      THE COURT:  Hold on.  Make sure you're just

21  answering the question.

22      THE WITNESS:  Ah, okay.  You're asking about

23  individual years.  I don't recall exact years, et

24  cetera.

25      Q.  (BY MR. MENSIK)  Would you like me to refresh

1    your recollection?

2         A.   If it's important to you.

3              MR. MENSIK:   Your Honor, may I approach?

4              THE COURT:   Yes.

5         Q.   (BY MR. MENSIK)   Mr. Young, this is a

6    certificate of release of federal tax lien, and this

7    lien was released on -- if you look at the bottom

8    left-hand corner -- 26th day of October, 2022; do you

9    see that?

10        A.   I do.

11        Q.   And then in the right-hand corner, unpaid

12   balance of assessment -- you see the $40,755.69?

13        A.   I see the number.

14        Q.   So this was a release of lien that you paid

15   in October of 2022; is that correct?

16        A.   Correct.

17        Q.   And that was proceeds from the sale of your

18   house in Texas?

19        A.   Correct.

20        Q.   So in 2022, 2020, you owe $40,000 on back

21   taxes, and then there's an additional $40,000 in

22   lawsuits relating to credit cards.

23        A.   Okay.

24        Q.   I want to talk about how you fit into the

25   picture in this case.   My clients are the Coles.

1   Obviously, you know them. You're married to their

2   daughter, Susan, right?

3      A.   Correct.

4      Q.   And that, obviously, would make you their

5   son-in-law, correct?

6      A.   Correct.

7      Q.   Now, you and Susan have one -- or one child

8   correct?

9      A.   Correct.

10      Q.   And his name is Jaeger?

11      A.   Jaeger.

12      Q.   And that -- to the best of your understanding

13   and knowledge, that's their only grandchild, correct?

14      A.   True.

15      Q.   Let's go to that sale of that house in Texas

16   in October of 2022. Did you -- did you see any profit

17   from the sale of that house?

18      A.   Sure.

19      Q.   Okay.

20      A.   I mean, "profit" is a flexible term because

21   you're in a house for 16 years, but yes. There was

22   takeaway, yeah.

23      Q.   So let me ask you this. After you paid

24   whatever it is -- judgments, tax liens -- did you and

25   Susan take anything in your pocket and pocket it after

25-80038-FPC    Doc 24-11    Filed 12/29/25    Entered 12/29/25 21:52:50    Pg 9 of 40

1    the sale of that house?

2         A.   Ballpark was, I think, $60,000 total, yeah.

3         Q.   What did you do with that money?

4         A.   Took care of the moving costs coming out here

5    from Texas and other relevant things like that, yeah.

6         Q.   Okay.  Because remember, we were looking --

7    talking to Ginny Tate earlier, and she said your

8    Fidelity account was sitting around about $1,600 on

9    January 1st, 2023; do you remember that?

10        A.   Mhm.

11        Q.   Okay.  So did you spend the money before

12   then, that $60,000, or after that?

13        A.   It would have been from October 22nd onward,

14   yeah.  Significant amount of it was actually spent on

15   the Coles.  That was part of what I used when I went

16   and repaired their water heater and things.  I bought

17   the equipment and all the materials for installation

18   and took that down with me.  So since you asked, yeah.

19   They've been a significant part of our cost center, as

20   well.

21        Q.   I want to talk to you about -- and I just

22   want to give the Court kind of a sense of the contact

23   between the parties over the years.

24        A.   Happy to.

25        Q.   Yeah.  You and Susan -- you were married

25-80038-FPC    Doc 24-11    Filed 12/29/25    Entered 12/29/25 21:52:50    Pg 10 of 40

1　because she was forgetting every day things that she

2　just knew the day before -- that this is what she had

3　in her account, and Linda brought that up and so

4　forth, and they wrote it down so she can look at it.

5　　　　Q.　The reference to Old West in that picture

6　with the box around it -- that's referring to Old West

7　Federal Credit Union; is that right?

8　　　　A.　Correct.

9　　　　Q.　And so as of September 22nd, 2023, you and

10　Susan knew -- because Susan has the information --

11　that the total amount that the Coles have in the Old

12　West Federal Credit Union accounts is $362,023.34?

13　　　　A.　Okay.　That's a balance there, yeah.

14　　　　Q.　That's right.　You guys know that that's the

15　balance?

16　　　　A.　Yeah.

17　　　　Q.　And you knew it on that day, that's all they

18　got in Old West?

19　　　　A.　Okay.　Yes.　As far as I know, yeah.　I might

20　have known it even a little sooner or later.　I don't

21　know.

22　　　　Q.　Let's go to the next page, 470.

23　　　　A.　Okay.

24　　　　Q.　Now, here's where I'll go to the -- the first

25　-- so you see your text that says, "and where is

1    that?"

2      A.   Mhm.

3      Q.   Then it starts, from Susan, "I finally,

4    between Dad and I, got her to show me the account."

5    And then Susan says, "Chase." Susan says, "Know how

6    much their nest egg is that she thinks she's going to

7    live on? Guess." Do you see all that?

8      A.   Mhm.

9      Q.   And then you guess, right?

10      A.   Mhm.

11      Q.   And then Susan says 69K; is that right?

12      A.   I see that, yes.

13      Q.   So on September 22nd, 2023, you and Susan

14    both knew that the total amount of money that my

15    clients had, that liquid cash, was the 69 in the Chase

16    account and the $362,000 in the Old West account?

17      A.   Okay. Yes.

18      Q.   And then you go down, and then you say, "So

19    they have about $2,300 a month in income from Social

20    Security and her little pension." Do you see that?

21      A.   Mhm. I was off, as it turns out. It was a

22    little more than that, but okay.

23      Q.   So you knew that aside from that money that

24    they have in that account, that all they got coming in

25    on a monthly basis is this $2,300 a month Social

25-80038-FPC    Doc 24-11    Filed 12/29/25    Entered 12/29/25 21:52:50    Pg 12 of 40

 1   Security income -- or a little more, like you say --

 2   and this little pension, right?

 3       A.   Yeah.

 4       Q.   Mr. Young, did -- were you annoyed that this

 5   1.4/5 million dollars had been spent down to an amount

 6   that's a little over $400,000?

 7       A.   It was just a realization of Linda's way of

 8   living, you know, and her idealism of the drawing

 9   plans for her house and, you know, so forth.  But it

10   wasn't anything like an open issue to me.

11       Q.   Not much concern to you?

12       A.   No.

13       Q.   Okay.  Now, you and Susan -- well, let me ask

14   you this.  This is September 22nd, 2023.  Isn't it

15   true that later, just -- what?  Three, four, five days

16   later, you drive down to Baker City to go move the

17   Coles' larger furniture items?

18       A.   Some of the things that were going on

19   there -- that's not the entire reason I went.

20       Q.   Okay.  And when you went down to move the

21   Coles' items, you took the Coles with you, right?

22       A.   No.

23       Q.   Okay.  So you left the Coles --

24       A.   Sure.

25       Q.   -- in Spokane, and then you were going to go

25-80038-FPC   Doc 24-11   Filed 12/29/25   Entered 12/29/25 21:52:50   Pg 13 of 40

1  she got frustrated.  She admits that in her

2  deposition, as well.

3      Q.  So the number on the 13th goes from 180 to

4  242, and she said to you and the bank and everybody

5  else that she wanted that 242 to come into your

6  account?

7      A.  It had already been designated to my account

8  on the order.  The credit union just changed the

9  dollar figure to amount to the amount it would take to

10  liquidate that account.

11      Q.  So the credit union already started the 180

12  process --

13      A.  Correct.

14      Q.  -- is that what you're saying?  And then now

15  it's just changing the existing order to this 242

16  number?

17      A.  That is correct.

18      Q.  And that's -- that's kind of the genesis of

19  this 242 number?

20      A.  Correct.  And those communications or any

21  other activities were handled directly with Linda with

22  their security protocols at the credit union.  It was

23  not involving me.

24      Q.  Let's go to Exhibit 23.  Now, I'm going to

25  try to just fly through this real quick, but this is

1    the gift letter that Linda Cole signed; is that

2    correct?

3       A.   Yes, it is.

4       Q.   She signed this on the 11th of October, 2023?

5       A.   That is correct.

6       Q.   Right.   You just testified that on the 13th,

7    that's where the 242 number came up -- the $242,000

8    number came up for the first time?

9       A.   No.   It came up on the 12th.

10       Q.   It came up on the 12th?

11       A.   Yeah.   Yeah, because it was -- we started

12    roughly in the morning making those phone calls.   The

13    first wire was done noon-ish, I think, something like

14    that.   Then Tara Crater felt reservations just from

15    Linda being remote and then her bank manager being on

16    vacation, so that actually arrived -- or that event of

17    her hesitancy arrived on the 12th.

18       Q.   I mean, you don't have a time machine, do

19    you?

20       A.   No.

21       Q.   All right.   Because this document that you're

22    proffering as a gift letter that entitles you to

23    $242,000 is signed on the 11th of October, and it

24    lists the gift amount of $242,314.62, but you have

25    testified now that that number wasn't even a number

1  that was even discussed until it was the 13th, and

2  then now it's the 12th. But it wasn't the 11th?

3      A.   No. This was signed the evening of the 11th

4  when we were sitting at the table.

5      Q.   So --

6      A.   And it was $180,000 to start with.

7      Q.   The evening of the 11th, Ms. Young --

8      A.   Cole.

9      Q.   Cole looks at you and goes, I'm going to give

10  you $242,314.62?

11      A.   On what day again?

12      Q.   The 11th, the date it's signed.

13      A.   No. It was 180. I just told you that. It

14  started out as $180,000. This was changed when they

15  changed the dollar figure to fit with what she was

16  liquidating from the account, but we just didn't --

17  none of us caught the date up here of being the 12th

18  being that designated date, or rather the 11th, and

19  updating that signature date to the new date for any

20  reason. It was family. We didn't really ever think

21  about any of that.

22      Q.   So my client signs this on the 11th.

23      A.   Mhm.

24      Q.   You make some changes to it, and then --

25      A.   It was Linda's necessary step to have me

25-80038-FPC   Doc 24-11   Filed 12/29/25   Entered 12/29/25 21:52:50   Pg 16 of 40

1   update this gift letter, yes.

2       Q.  Okay.  You know, in your deposition, you

3   didn't tell me that there was an update to this gift

4   letter with this new dollar amount.

5       A.  It wasn't material.  They're not required to

6   be notarized or anything.  They don't even need a gift

7   letter in the State of Washington anyway, in some

8   cases.

9          THE COURT:  The question was, did you not

10  reveal the change in the gift letter during your

11  deposition?

12        THE WITNESS:  It didn't come up at that time,

13  no, that I recall.

14      Q.  (BY MR. MENSIK)  And not only did you

15  actually miss the dates for the signature, but then,

16  you know, with regards to the date of the gift -- and

17  you can say what you want, but you talked about that

18  242 number being finally discussed on the 13th.

19      A.  12th.

20      Q.  Well -- and I can show you the deposition if

21  you would like.  We can do that.

22      A.  If you would like to.  I'm just telling you,

23  we knew by the end -- mid-afternoon, roughly, of the

24  12th that she had gotten frustrated and had decided to

25  liquidate her accounts.  I don't recall if I may have

25-80038-FPC   Doc 24-11   Filed 12/29/25   Entered 12/29/25 21:52:50   Pg 17 of 40

1        MR. MENSIK:  Thank you, Your Honor.

2        Q.   (BY MR. MENSIK)  Let's go to P-9.  Are you

3    there, Mr. Young?

4        A.   9, you said?

5        Q.   9.

6        A.   Yep.

7        Q.   Okay.  And just to be clear, on this

8    document -- this is a residential purchase and sale

9    agreement, and that's your signature down there, about

10   halfway down to the left, right?

11       A.   Yeah, e-signature.  They do everything on

12   Docusign, I guess.

13       Q.   And that's your e-signature on October 13th,

14   2023?

15       A.   Correct.

16       Q.   And you signed this before the wire transfers

17   hit your account on October 16th, 2023, correct?

18       A.   Sure.

19       Q.   And in fact, you signed this before you

20   emailed the wire transfer information off to Old West

21   Federal Credit Union to facilitate those transfers?

22       A.   The final indemnification form that was

23   notarized, yes.  The wire forms were already executed

24   by the 13th.  Everybody who has been talking about

25   this and Linda Cole's testimony has gotten that wrong

25-80038-FPC   Doc 24-11   Filed 12/29/25   Entered 12/29/25 21:52:50   Pg 18 of 40

1   every time, so they need to get that straight.

2       Q.   Yeah.  Let's talk about the final signature

3   on these wire forms, while we're talking about it.

4   Isn't it true, according to your story, that Ms. Cole

5   signed that front page of the wire transfer form

6   itself that actually shows where the money is going on

7   -- it was October 15th, 2023, right?

8       A.   I believe so, yeah.

9       Q.   Yeah.  When she was down in Baker City?

10      A.   Mhm.

11      Q.   So before she, according to your story,

12  signed that, you had signed this?

13      A.   Okay.

14      Q.   Is that correct?

15      A.   The wire forms do not require a signature.

16  That was told to us by the bank.  They're executed

17  over the phone through the security protocol.  They

18  were done -- that's when the funds moved out of her

19  account on the 12th.

20      Q.   Do you agree that on October 13th, 2023, you

21  didn't have the money to purchase this Golden

22  Court house?

23      A.   In my bank account, no.

24           MS. YOUNG:  I'm sorry, Your Honor.  Could I

25  have that question read back?  I didn't catch that.

25-80038-FPC   Doc 24-11   Filed 12/29/25   Entered 12/29/25 21:52:50   Pg 19 of 40

1   -- I don't remember what exhibit it was.  But the

2   email forwarding to myself was 10:10, 10:12, something

3   like that.  So it was roughly in that hour, roughly.

4       Q.  So at 11:30 on the 14th, you knew that the

5   wire for 119 --

6       A.  Mhm.

7       Q.  -- did not list the recipient as Linda Cole;

8   it listed you?

9       A.  Correct, yeah.  That was error on the bank's

10  part.

11          MS. YOUNG:  Objection, Your Honor.  I would

12  like clarification on what he just said.  That wasn't

13  clear.

14          THE COURT:  That's not an objection.  Go

15  ahead.

16          THE WITNESS:  Say the statement again.  You

17  said I knew what?

18          THE COURT:  I'll read it.  "So at 11:30 on

19  the 14th, you knew that the wire for 119 did not list

20  the recipient as Linda Cole; it listed you?"

21      A.  That is true.  And we told her that at the

22  front door.  Susan and I both were right there, and we

23  showed that to her.

24      Q.  Why not at 11:30 on Friday --

25      A.  Not Friday.  This is Saturday now.

25-80038-FPC   Doc 24-11   Filed 12/29/25   Entered 12/29/25 21:52:50   Pg 20 of 40

1    Q.   14th, okay.

2    A.   Saturday.

3    Q.   Okay.  All right.  Well, why not -- why not

4    just stop with regards to that 119 transfer?

5    A.   I told Susan in a text.  We have it in our

6    body of evidence.  I told her the night before.  I

7    said, I don't even want the 119 to get wired out of

8    her account.  I'd rather she leave it in there so that

9    it's kind of out of the way for now.  But yeah.  Once

10   the -- once she got frustrated and told the credit

11   union to liquidate all the accounts, you know, the

12   stuff is going live, if you will.

13   Q.   Okay.  So let me just cut to the chase on

14   this.  On the 14th, you know that the 119 transfer

15   form lists you as the recipient instead of Ms. Cole?

16   A.   After we printed it and looked at it, yeah.

17   And then told her about it.

18   Q.   Did you email the bank back and say, hey, can

19   you guys quickly change the recipient on this form?

20   A.   It was a Saturday.  I didn't even know if

21   those little, small banks were open on Saturdays.  And

22   I just assumed not, and we had an upcoming date where

23   the dollars for the earnest money did need to get

24   submitted to the title company.  So there was not a

25   big rush because we had already been four days.  I

25-80038-FPC   Doc 24-11   Filed 12/29/25   Entered 12/29/25 21:52:50   Pg 21 of 40

1   mean, there was not rushing at all.  But the potential

2   was there.  And I left it up to Linda and said, you

3   know, we can do something with this, or we can leave

4   it, and I'll just take care of sending it over to you

5   later.

6          Q.   So let's just agree that on October 16th,

7   you're communicating with the bank about the wire

8   transfers, right?

9          A.   Just the sending the forms, sure.

10         Q.   You didn't email the bank then and say, hey,

11  can you just change these routing number -- or this

12  account number and the recipient so it's not coming to

13  me, it's Linda?

14         A.   They wouldn't have touched that with my

15  direction, anyway, because those would have been a

16  material modification to the document, and they would

17  have had to go through a process and so forth,

18  probably.  We didn't have that need because Linda had

19  already agreed to what we were talking about, and she

20  went and went to the notary and signed those documents

21  in front of the notary already.

22         Q.   So --

23         A.   That issue had become null.

24         Q.   You agree that on the -- on October 16th, you

25  agree that with regards to the 119 transfer, that

25-80038-FPC   Doc 24-11   Filed 12/29/25   Entered 12/29/25 21:52:50   Pg 22 of 40

```
 1    wasn't a pressing issue?
 2         A.   No.
 3         Q.   You didn't need to get that money over, wired
 4    over, right?
 5         A.   It wasn't an issue either way.  It was simply
 6    a -- a transaction that had already gotten done,
 7    approved, and Linda was happy, and they had all left
 8    and gone back to Baker City, Susan and her parents, to
 9    do the third move and bring things back up to the
10    house, where they were living already.
11         Q.   So on October 17th, the day after the wire
12    transfers hit your account, the 119, specifically --
13         A.   What day again?
14         Q.   October 17th.
15         A.   17th?  Okay.  Go ahead.
16         Q.   The day after the 119 wire transfer hits your
17    account.  So you've got -- the 242 hits and the 119,
18    correct?
19         A.   Yes.
20         Q.   And the 119, according to your own testimony,
21    was supposed to go to Ms. Cole, correct?
22         A.   Right.
23         Q.   What action did you take on the 17th to have
24    that money wired over to her account?
25         A.   None.  It wasn't pressing.  As you just
```

25-80038-FPC   Doc 24-11   Filed 12/29/25   Entered 12/29/25 21:52:50   Pg 23 of 40

1 described, none of it was pressing.  The only date we

2 had of any issue to work on was the 18th deadline to

3 provide the earnest money on the purchase agreement.

4    Q.   How about the 18th?  What steps did you take

5 to get that money over to Linda Cole?

6    A.   None.  I'm trying to do my job and handling

7 the transactional information with the bank.  I had to

8 go find a BofA branch and get a wire transfer for the

9 earnest money.  It just wasn't on the radar, wasn't

10 necessary.

11    Q.   You know, I'm going to show you some bank

12 records here in a minute showing you doing all sorts

13 of internal transfers between your own accounts on the

14 16th through October 18th.

15    A.   Okay.

16    Q.   You had time to do that, but you didn't have

17 time to wire Ms. Cole's money back into her own

18 account?

19    A.   As I've already described, they had empowered

20 me to work on the remodel back in April, May, and that

21 was work that was going to be coming up, and I even

22 mentioned to her, it really is not a huge issue anyway

23 at the moment because there's work to be done on the

24 remodel.  I had already made arrangements with

25 contractor guys and some friends of mine in Oregon.

25-80038-FPC    Doc 24-11    Filed 12/29/25    Entered 12/29/25 21:52:50    Pg 24 of 40

 1    My brother is a contractor, as well.  And so things

 2    were beginning to move on these various projects, and

 3    we can take care of it whenever.  That was not

 4    specifically a big issue at the moment.

 5        Q.   And these specific projects that you were

 6    just referring to -- none of that actually got done,

 7    did it?

 8        A.   Well, Linda threw the wrench, didn't she?  A

 9    week later or less, three days -- we barely made it

10    three days, yeah.  And that's -- there's a story

11    behind that, I'm sure.

12        Q.   Well, sure.  October 20th, 2023.  Let's go to

13    Exhibit 37.  37, page 32.

14        A.   32?  Under 37?

15        Q.   Exhibit 37, page 32.

16        A.   Yep.

17        Q.   All right.  I want to take and draw your

18    attention to starting October 16th, 2023, that

19    transfer, that Zelle transfer; do you see that?

20        A.   Let's see.  The very first one, you mean?

21    What date was it?

22        Q.   October 16th.

23        A.   Oh, 16th.

24        Q.   2023.

25        A.   There's a couple.  Which one --

25-80038-FPC   Doc 24-11   Filed 12/29/25   Entered 12/29/25 21:52:50   Pg 25 of 40

1     Q.   Let's just go to the first one.

2     A.   Okay.

3     Q.   All right.  Now, I want you to kind of draw a

4   line across there in your mind, and then I want you to

5   go down to October 18th, 2023.

6     A.   Yep.

7     Q.   And then just kind of draw a line there in

8   your mind.

9     A.   Okay.

10     Q.   How many internal banking transfers and

11  transfers to Susan do you do between October 16th and

12  October 18th?

13     A.   You're saying transfers?

14     Q.   Transfers between, you know, in your own

15  accounts or to Susan's individual account?

16     A.   A couple to Susan, and I think it looks like

17  three total there.  The two larger ones to push it

18  over into the investment side.  And what else is in

19  here?  Yeah, that's transfers.  So I would say, like,

20  three or something.  Three -- I'm sorry.  Two and then

21  three.  So five, I guess.

22     Q.   Do you remember, in your deposition, when I

23  asked you why you couldn't, on the 17th, transfer the

24  money -- the 119 from your account to Linda's account?

25  Do you remember what you told me during your

25-80038-FPC   Doc 24-11   Filed 12/29/25   Entered 12/29/25 21:52:50   Pg 26 of 40

1  deposition?

2      A.  Probably not, because you never sent me a

3  copy, or I didn't get any information on how to get

4  one.

5      Q.  Remember you said you were recovering from a

6  kayak crash?

7      A.  Yeah, that's true.

8      Q.  But your recovery from the kayak crash did

9  not stop you from doing all of these wire transfers?

10      A.  True.  I was sitting at my desk and stuff, so

11  that happens.

12      Q.  Now, that October 17th transfer first to

13  Susan for $5,000.

14      A.  Okay.

15      Q.  What's that for?

16      A.  Running money, paying the bills.  She had to

17  take care of the finances of the household most of the

18  time, so that was to get her funded so she could take

19  care of things.

20      Q.  And then that same day, there's another one

21  for $1,000; do you see that?

22      A.  Mhm.

23      Q.  Right?

24      A.  Yeah.

25      Q.  Now, we don't have to do it.  I don't want to

25-80038-FPC   Doc 24-11   Filed 12/29/25   Entered 12/29/25 21:52:50   Pg 27 of 40

1  waste the Court's time. But if I tell you that the

2  amounts of money that you give to Susan prior to this

3  for running errands and whatnot is $1,200, $1000

4  dollars a month, would you have any reason to doubt

5  that number?

6      A.  Approximate, probably. Okay.

7      Q.  So right after those wire transfers hit your

8  account, all of a sudden, you got $6,000 you transfer

9  over to Susan?

10     A.  Mhm. Do you know how much --

11         THE COURT: You can't ask the question.

12         THE WITNESS: Okay.

13     Q.  (BY MR. MENSIK) Is that a yes?

14     A.  I'm sorry. Say the question again.

15     Q.  Is that a yes?

16     A.  Say the question again.

17         THE COURT: "So right after those wire

18  transfers hit your account, all of a sudden, you got

19  $6,000 you transfer over to Susan?"

20         THE WITNESS: Yes I sent that over.

21     Q.  (BY MR. MENSIK) And then on 10/18, you

22  actually used the money that you get from the Coles to

23  fund the escrow payment?

24     A.  Correct.

25     Q.  Because you didn't have the money to pay for

25-80038-FPC   Doc 24-11   Filed 12/29/25   Entered 12/29/25 21:52:50   Pg 28 of 40

1  the escrow payment.

2      A.   This is the fulfillment of the family plan,

3  and they had contributed those down payment funds via

4  gift letter, yes.

5      Q.   Do you know what Susan used that $6,000 that

6  was given to her on the 17th for?

7      A.   She used her Woodforest account.  I don't

8  access that, so I don't know.  Largely, she had been

9  supporting taking Ted and Linda places and traveling

10 back and forth to Baker City and all kinds of

11 different things for months, so there were just costs.

12     Q.   So in those three days, if I tell you it's

13 about 170, 160 thousand dollars in transfers and

14 expenditures out of this account, do you have a reason

15 to disagree?

16     A.   No.  Absolutely I was going to transfer funds

17 out of it because that was a non-interest earning

18 account, and the funds would be poorly managed to sit

19 there.

20     Q.   Now, if I go back one page to page 31,

21 there's a withdrawal, and it's the first one on

22 October 20th to David Engen, DDS; do you see that?

23     A.   Yes.

24     Q.   All right.  So on that day, you go ahead and

25 make a payment for $4,500?

```
 1        A.    Yes.

 2        Q.    What was that for?

 3        A.    Orthodontist.

 4        Q.    For who?

 5        A.    My son.

 6        Q.    And then on the 23rd, if you look down there,

 7   you go to the Apple store, and you spend $1,800; do

 8   you see that?

 9        A.    Yep.

10        Q.    And then two below that, $395 to the Apple

11   store?

12        A.    Yes.   Phones were at the bottom of the river.

13        Q.    Yeah.   And then October 23rd, someone gets

14   $275 done at Wonders Nails and Hair; do you see that?

15        A.    I don't see that.   Oh, there it goes.   Yeah.

16   Yeah, I got Susan a little spa -- spa treatment card

17   over at the Aveda place.

18        Q.    Was that your money, or was that the Coles'

19   money that paid for the spa treatment?

20        A.    Comingled funds.   The funds were coming in to

21   do things for the household that we had all agreed to

22   do things together, and that's what we were involved

23   in.   We had spent thousands of dollars already helping

24   them in multiple different activities, so that's where

25   we were at the moment.
```

25-80038-FPC    Doc 24-11    Filed 12/29/25    Entered 12/29/25 21:52:50    Pg 30 of 40

1    to help her correct her thinking, yes.

2        Q.   Correct her thinking?

3        A.   Yeah.  We do the same thing with our child.

4    It's work on the thinking, and then it works out

5    better.

6        Q.   Go to Exhibit P-16.  Now, I'm going to draw

7    your attention to the -- this is -- well, this is a

8    portion of a November 7th, 2023 motion for temporary

9    restraining order transcript.  It's been admitted.

10       A.   What number are you looking at?

11       Q.   Exhibit 16, page 1.

12       A.   Yes, go ahead.

13       Q.   So here you are saying, over this page and

14   the next page, that you have spent somewhere roughly

15   around -- what, $82,000 of the Coles' money by the

16   date of this hearing?

17       A.   It was an estimate.  I didn't know the exact

18   number.

19       Q.   Go to page 2 of this exhibit.  And go to line

20   8.

21       A.   Yes.

22       Q.   It says, "The Court:  I will just -- then,

23   the 280 I'm going to freeze for now.  The earnest

24   money, I think, is with the brokerage, so that will

25   just sit there.  And we'll have to deal with the rest,

1    Mr. Merritt, when we get -- I understand.  I

2    understand."

3        So do you remember the Court saying that that 280

4    that was left of the Coles' money was frozen?

5        A.   Yes, she said that.

6        Q.   What did you understand that to mean?

7        A.   Frozen in an account.  I didn't know exactly

8    what it meant.  Never had to deal with that before.

9        Q.   Did you interpret that as -- well, we know

10   that you spent a significant portion of that 280 after

11   the Court said that, right?

12       A.   Yes.

13       Q.   Okay.  So did you just disregard what the

14   Court said about freezing the funds?

15       A.   I had no choice because I had filed for FMLA

16   leave to help with the move and Washington State

17   leave, and I had done that at the end of October to

18   help with all the work that was upcoming, and so I was

19   off leave with no income for 17 weeks, I think it was.

20   And it turned out that a document that was required to

21   be signed by the person you're helping was now my

22   adversary who would not help at all.  So I got stuck

23   with no income, stuck on leave, and I had no way to

24   take care of normal expenses.

25       Q.   Why do you need FMLA leave when the purpose

25-80038-FPC    Doc 24-11    Filed 12/29/25    Entered 12/29/25 21:52:50    Pg 32 of 40

1  of, according to you, taking this FMLA leave is to

2  work on this house that is not being purchased?

3       A.   What are you talking about?  House that was

4  not being purchased?

5       Q.   Why did you take the FMLA leave?

6       A.   I took it before she -- she, you know, left

7  the family arrangement.

8       Q.   What day was your last day of work before you

9  started leave?

10      A.   I had started the file -- the process of the

11 paperwork in October.  So, like, mid-October, I think.

12 And I think I still got a paycheck in early November,

13 if I recall correctly.

14      Q.   November 15th?

15      A.   Yeah, the tail end of what was already in the

16 pipeline kind of thing.  I think the official start

17 date was the 30th or maybe 28th or 9th of October at

18 the time.

19      Q.   Why didn't you stop the FMLA leave?

20      A.   Because you have to go through quite a bit of

21 paperwork and stuff to launch that.  You're letting

22 your manager of the company know.  It goes up the

23 chain through HR.  It's a third-party administrator

24 company, Matrix Absence, I believe.  It's a pretty

25 involved process.  So then I got hung out to dry

25-80038-FPC    Doc 24-11    Filed 12/29/25    Entered 12/29/25 21:52:50    Pg 33 of 40

1   because they left and, you know, disrupted the
2   equilibrium of our agreed family plan, as is per
3   Linda.
4       Q.   So just doing the math here, because Ms. Tate
5   explained it, that it's $8,800 a month in net funds
6   that you receive as pay, payroll.  If you get -- if we
7   look at December and January, what day did you come
8   back?
9       A.   Supposed to be the -- right after the holiday
10  ends, so, like, January 6th, supposed to be.  But then
11  they didn't -- it takes, like, a month for the process
12  to get backed out of HR.  It wasn't until, like, the
13  17th of February before I saw a paycheck.
14      Q.   So let's just say you don't get paychecks for
15  three months.
16      A.   Mhm.
17      Q.   That's $8,800 times three.
18      A.   Okay.
19      Q.   So we're talking about $26,000?
20      A.   30-ish, maybe.  Yeah, okay.
21      Q.   Okay.  Why didn't you just spend $30,000 of
22  their monies instead of all of the money that you
23  spent?
24      A.   I have no answer of that.  There's other
25  things involved that are not being brought out, so it

25-80038-FPC   Doc 24-11   Filed 12/29/25   Entered 12/29/25 21:52:50   Pg 34 of 40

1    makes it all look bad.  But I wasn't letting Linda's

2    aberration of mind disrupt the family plan, including

3    her remodel, which now another year has gone by

4    without it being finished.

5        Q.  Go to Exhibit P-13.  Mr. Young, this is a

6    statement of credit denial, termination, or change; do

7    you see that?

8        A.  Mhm.

9        Q.  It's dated November 10th, 2023.  And the

10   applicant's name is Eric Young; do you see that?

11       A.  Okay.

12       Q.  And so this document -- it says "description

13   of action taken."  It says, "Thank you for your recent

14   application for credit.  Your request for a loan was

15   carefully considered, and we regret that we are unable

16   to approve your application at this time for the

17   following reasons."  Do you see that?

18       A.  Mhm.

19       Q.  And then it says -- down there, there's

20   "garnishment, attachment, foreclosure, repossession,

21   collection action, or judgment."  Do you see that?

22   There's an X on it.

23       A.  Yeah, somewhere.

24       Q.  Do you see that?

25       A.  I'm not sure which one you're seeing.

25-80038-FPC    Doc 24-11    Filed 12/29/25    Entered 12/29/25 21:52:50    Pg 35 of 40

1    Q.   And at this time, it was your intention to

2   provide an additional $10,000 to the sellers in

3   earnest money to keep the sale of the Golden

4   Court house alive?

5    A.   Incorrect.  It was not $10,000.  We already

6   had $6,000 down in earnest money, the incentive to

7   help them keep engaged, because we didn't know what

8   this whole case thing was going to do.  It was all

9   psychosis to us because we have thousands of pages of

10  evidence.  So we were just trying to keep it alive,

11  that hopefully the Court would see sense of what was

12  actually going on.  So it was an additional $4,000 for

13  a total of $10,000 that would have been earnest money.

14  It still counted towards purchase.

15   Q.   That you were trying to spend at this time?

16   A.   Looking at how it could be arranged to help

17  the seller stay with the agreement that was -- that we

18  were already under contract for, yeah.  We had a legal

19  liability, so.

20   Q.   So I want to ask you -- and I apologize to

21  the Court.  I just omitted those February bank records

22  from your accompanying account, but I want to ask you

23  about some of those expenditures, and I know that

24  Ginny Tate talked to you about this.

25   So do you remember the Court ruling on February

25-80038-FPC    Doc 24-11    Filed 12/29/25    Entered 12/29/25 21:52:50    Pg 36 of 40

1    2nd, 2024, entering a permanent -- or a preliminary

2    injunction and ordering you to turn over all of the

3    funds that you had obtained from the Coles and give it

4    to Michael Merritt?

5         A.   We learned about it later.  We weren't at

6    that hearing.  We had standing activities.  We were

7    getting Susan her passport and Jaeger his passport

8    because they never had them before, and that was just

9    maintenance.  I already had mine.

10        Q.   All right.  So it just so happens that

11   essentially at that time, you're going to get

12   passports?

13        A.   Yeah.

14        Q.   And in fact, exactly on the day that the

15   Court grants the preliminary injunction and orders you

16   to transfer the money over to Michael Merritt, that

17   exact day, February 2nd, you are spending money over

18   there at --

19        A.   Seattle.

20        Q.   Yeah.  Is that correct?

21        A.   I guess, yes.  We had to go over to Seattle

22   to get the passports.

23        Q.   After the entry of the order directing you to

24   turn the money over to Mr. Merritt's account, you

25   purchased an RV, correct?

25-80038-FPC    Doc 24-11    Filed 12/29/25    Entered 12/29/25 21:52:50    Pg 37 of 40

1    A.    Sometime later, yeah.

2    Q.    And that was about $82,000?

3    A.    Yes.    Total, I guess, yeah.    Tax and all

4    that.

5    Q.    What was the point of purchasing that RV?

6    A.    Again, under the family plan that I was

7    operating under -- and I wasn't allowing Linda's

8    psychosis to derail everything -- there was already

9    intended a plan where they were going to be out of the

10   house, and I was going to have workers being down

11   there at the Baker City house to get those remodeling

12   elements done.    And I expected for there to be a point

13   where the house was not livable.    That was going to

14   involve having a place to stay.

15       There's not much there to -- there's not, like, a

16   rental option much there because it's a tiny town.

17   And so I had already intended -- they had a RV when

18   they were moving up.    My thought was I'll use that RV

19   to go down and be in a place and do work on their --

20   on their place.    The other aspect was the lot up here

21   in Spokane that needed to be built.    So in part of

22   this overall plan of working on family activities and

23   taking the family on vacations and things like that,

24   that was what I had anticipated there being the RV

25   for.

25-80038-FPC    Doc 24-11    Filed 12/29/25    Entered 12/29/25 21:52:50    Pg 38 of 40

 1      Q.   So purchasing the RV was, in ways -- I don't

 2   want to misstate your testimony -- kind of benefiting

 3   the Coles?

 4      A.   It was benefiting the family under the family

 5   arrangement.  Now, when the Coles backed out of the

 6   family arrangement, they lost the right to have claim

 7   on many of these aspects that we would have provided

 8   in that arrangement, including the fact that they

 9   gifted the funds, which, under Washington law,

10   interfamily law, and superior court law -- Supreme

11   Court cases, you don't even need a gift letter.  It's

12   family contribution or family gifting.

13      Q.   And then you bought Starlink in February; do

14   you remember that?

15      A.   True.

16      Q.   Yeah.  And Starlink is nice because it's

17   something that Elon Musk created that you get really

18   good satellite reception kind of anywhere you're at,

19   right?

20      A.   Sure.

21      Q.   So you get a passport, satellite internet you

22   can use anywhere in an RV all in February of 2024 --

23      A.   Okay.

24      Q.   -- after the Court tells you to give the

25   money back?

```
 1        A.   Okay.

 2        Q.   Just asking.  That's all true, right?

 3        A.   Those are activities, yes.

 4        Q.   Were you thinking about running to Canada?

 5        A.   No.

 6        Q.   Do you have family in Canada?

 7        A.   Susan's grandparents are from Canada.

 8        Q.   Yeah, they do.  They're from Canada.  Where

 9   do they live in Canada?

10        A.   Grandparents are dead, but the Canada

11   citizenship is actually available to her in a few

12   months, actually.

13        Q.   Go to Exhibit P-14.  Do you remember creating

14   Exhibit P-14?

15        A.   As I told you in deposition, I can't attest

16   to this copy, and I don't know that it's complete.

17   It's a copy.  It is a copy like what I have produced

18   in the past, but I don't know where this one came from

19   or what date it was created.

20        Q.   Do you remember in your deposition initially

21   saying it was something that you created?

22        A.   It is like the one I created.  I cannot

23   attest to its completeness is all I was indicating.

24             THE COURT:  That's not the question.

25        Q.   (BY MR. MENSIK)  Do you remember in your
```

25-80038-FPC   Doc 24-11   Filed 12/29/25   Entered 12/29/25 21:52:50   Pg 40 of 40